ZONA WILSON, Administratrix of Estate of NOAH H. WILSON, v. CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY, Appellant.— 296 S. W. 1017.

Division One, June 25, 1927.

**1. SUFFICIENT EVIDENCE: Aided by Defendant: Demurrer at Close of Case.** Where defendant does not stand on its demurrer offered at the close of plaintiff's case in chief, but puts in its own evidence, a final demurrer offered at the close of the whole case requires a searching of all the evidence to see if plaintiff's case was aided by defendant's evidence.

**2. NEGLIGENCE: Collision of Trains: Res Ipsa Loquitur: Disregard of Orders.** In an action for the death of a fireman caused by a head-on collision of freight trains on the main line in the open country, it cannot be ruled that plaintiff relied upon the doctrine of **res ipsa loquitur** where defendant offered evidence showing, in harmony with the allegations, that the conductor and engineer of the train on which deceased was fireman, both by the duplicate clearance cards and train orders and the rules of the company, knew, or would have known if they had read the cards and orders, that the other train was entitled to the track, and that the conductor, who had power to stop the train, sat in the caboose and permitted the train to run four miles to the point of collision without reading the cards or orders, or discovering the engineer's negligence in entering upon the main track.

**3. ————: ————: Contributory or Sole Cause: Federal Act.** If a railroad company, because of the failure of its conductor and engineer to read and observe duplicate clearance cards and train orders, negligently runs one

of its trains into another and thereby causes the death of the fireman, the negligence of the fireman, in failing to read the cards and orders given to the engineer and stating that the other train is entitled to the track, and because of such neglect further fails to prevent the engineer from running the train on to the track and into a head-on collision with the other train, is not the sole cause of his death, but only a contributing cause; and under the Federal Employers' Liability Act the railroad company is liable in damages for injury or death "resulting in whole or in part" from the negligence of any of its officers, agents or employees. Under that act no negligence on the part of the fireman, however gross or proximate, can, as a matter of law, bar a recovery, unless it is the sole cause.

4. NEGLIGENCE: Contributory: Fireman: Collision: Surmise. Under the Federal Employers' Liability Act the burden of proving contributory negligence rests upon the defendant. It cannot be made to rest upon surmise or conjecture. There being a steep hill extending from the station where the engineer received the train orders almost to the place of the head-on collision with another train, and it being customary for the fireman to finish firing the engine at such place before reading the orders, it can only be surmised, in the absence of evidence, that he did read them or knew their purport before the collision.

5. ——: ——: ——: Testimony: Credibility: Matter of Law. The testimony of a special agent that he arrived at the place of the head-on collision about a half hour after it occurred and took the watches, money, keys and papers of the four deceased employees, and from the pockets of the fireman the clearance cards and train orders, cannot be accepted as conclusive, nor can the fireman's contributory negligence in failing to read them be based thereon as a matter of law, but the credibility of such testimony was for the jury to determine.

6. ——: ——: Instructions: Damages. In an action grounded on the Federal Employers' Liability Act, an instruction telling the jury that if they find that while the deceased fireman was firing the engine the defendant carelessly and negligently caused it to collide head-on with the engine of another train, and that by reason of such collision said fireman was killed, and if you further find that the said fireman "was not guilty of any negligence contributing in any wise to his death, then your verdict should be for the plaintiff," is not erroneous, where the fireman's contributory negligence can only be surmised, or is to be inferred from testimony whose credibility is for the jury. Nor is another instruction erroneous in telling the jury that if they find that defendant and the fireman were both guilty of negligence they should return a verdict for plaintiff, but not for the full amount of damages sustained, but only for such a proportionate amount thereof as the amount of negligence attributable to defendant bears to the entire negligence attributable to both. Nor are said instructions contradictory, misleading or confusing.

---

Corpus Juris-Cyc. References: **Master and Servant**, 39 C. J., Section 1220, p. 1004, n. 72; Section 1294, p. 1102, n. 86; Section 1345, p. 1164, n. 43; Section 1380, p. 1201, n. 58; Section 1402, p. 1220, n. 71; Section 1426, p. 1247, n. 75. **Negligence**, 29 Cyc., p. 601, n. 60; p. 657, n. 56. **Trial**, 38 Cyc., p. 1550, n. 47; p. 1605, n. 69.

Appeal from Livingston Circuit Court.—*Hon. Arch B. Davis,* Judge.

AFFIRMED.

*H.· J. Nelson, J. C. Carr, E. M. Spencer* and *J.· G. Trimble* for appellant.

(1)   The peremptory instructions to find for defendant asked at the close of the evidence for ·plaintiff and at the close of all the evidence in the case, should have been given. ·  (a)   It was the duty of· the deceased to prevent the accident.   He would have done so if he · had performed his duty.   He read and knew the orders (found in his pocket), knew second No. 72 carried signals indicating third No. 72 was following, and hence knew he had no right to leave Laclede before the arrival of third 72; he "knew the danger of the situation," knew his duty "to call down" the engineer, knew his duty "to correct any oversight or mistake," but failed to do his duty.   His duty was primary, entire and separate from and equal to and ·independent of that resting on any other employee.   The negligence of de- ·ceased must in law be deemed the sole proximate cause of his death. Frese v. Railroad, 290 Mo. 501, 263 U. S. 1; Gt. Nor. Railroad· v. Wiles, 240 U. S. 444; Davis v. Kennedy, 266 U. S. 147; M. K. & T. Ry. v. Collier, 157 Fed. 347; Yadkin Railroad v. Sigmon, 267 · U. S. 577 (for facts, see 120 S. E. 56).   (b)   Plaintiff attempted to make ·a case by relying upon the doctrine of *res ipsa loquitur*.   The petition charges specific negligence.   The proof (other than the negligence of deceased) made by plaintiff was only that there was a collision.   The doctrine of *res ipsa loquitur* does not apply. ·  Pointer v. Mountain Ry. Const. Co., 269 Mo. 104; Grimm v. Globe Printing Co., 232 S. W. 678; Mayfield v. Railroad, 272 S. W. 1051.·  Inferences and presumptions cannot be indulged in Federal Employers' Liability actions.   Nor is the doctrine of *res ipsa loquitur* applicable. Negligence must be established by evidence.   Raftery v. P. & W. V. ·Railroad, 131 Atl. 470; N. O. & N. E. Railroad v. Harris, 247 U.·S. 367; N. Y. C. Railroad v. Winfield, 244 U. S. 147; Patton v. T. & P. Railroad Co., 179 U. S. 658.   If inference, presumption and *res ipsa loquitur* (or either of them) were permissible in Federal Employers' Liability actions,· they could not be invoked in this case for the reason that plaintiff pleaded a specific act of negligence.   Duffy v. McGee, 196 Mo. App. 399; Hennekes v. Beetz, 217 S. W. 533; Grimm v. Globe Printing Co., 232 S.·W. 676. Even if applicable, the doctrine would not solve this case. ·  Gt. Nor. Railroad v. Wiles, 240 U. S. 448.   (c)   Plaintiff made no ·attempt to prove negligence on the part of defendant.   She relied entirely upon the happening of the accident, though proving negligence on the· part of the deceased.   There was no evidence to go· to the jury. Taylor v. Ry., 240 S. W. 512.   In Federal Employers' Liability actions, plaintiff must prove defendant was guilty of the negligence charged in the petition.   Nelson v. Ry., 148 Pac. 388; Fish v. Rail-

road, 263 Mo. 106. (2) It was error to give plaintiff's Instructions 1, 2 and 3. (a) Plaintiff's Instruction 1 allowed the jury to find the deceased not negligent at all. He was negligent as a matter of law. Gt. Nor. v. Wiles, 240 U. S. 448; Frese v. Railroad, 290 Mo. 515, 263 U. S. 1; M. K. & T. Railroad v. Collier, 157 Fed. 362; I. C. Railroad v. Ship, 174 Fed. 354. (b) This error is not cured by question of concurrent negligence attempted to be submitted by Instruction 3. Taking Instructions 1 and 3 together, the court cannot determine whether the jury found under number 1 that the deceased was not guilty of any negligence, or whether they found he was guilty of contributory negligence and therefore reduced the damages under Instruction 3. (c) Instruction 1 does not follow the charge of negligence made in the petition nor the proof made by plaintiff. An instruction must conform to the charge of negligence made in the petition and conform to the testimony limited to that charge. State ex rel. v. Ellison, 270 Mo. 653; Degonia v. Railroad, 224 Mo. 564, 589; Hufft v. Railroad, 222 Mo. 286; Moellman v. Lumber Co., 134 Mo. App. 485. (d) It does not state the facts (or acts) which would constitute negligence on the part of the defendant—leaves the jury to guess and speculate. It submitted a question of law to the jury. Winslow v. Ry., 192 S. W. 121. (e) Instruction 3 allowed the jury to find that the deceased's negligence was contributory only. His negligence in failing to "call down" the engineer was primary, separate and entire. The negligence was his negligence alone—his duty in this regard could not be delegated to, nor participated in by, another. This proof of negligence was made by plaintiff. His negligence was not "contributory." Marks v. Bauers, 3 Fed. (2nd Series) 518; Yadkin Railroad Co. v. Sigmon, 267 U. S. 577. His negligence in failing "to correct any oversight or mistake" was primary, not contributory. N. & W. Railroad v. Earnest, 229 U. S. 120; M. K. & T. Railroad v. Collier, 157 Fed. 362. Where one neglects to perform a specific duty, it matters not that others also may have been negligent in some particulars. His negligence is not contributory to that of the others. Frese v. Railroad, 290 Mo. 515, 263 U. S. 1; Gt. Nor. Railroad v. Wiles, 240 U. S. 444; Yadkin R. Co. v. Sigmon, 267 U. S. 577; Davis v. Kennedy, 266 U. S. 147. (f) Instructions 1 and 3 are conflicting and misleading and were confusing to the jury. Mansur-Tebbets Imp. Co. v. Ritchie, 143 Mo. 613; State ex rel. v. Ellison, 270 Mo. 656. (g) Instructions 1 and 3 purport to cover the entire case, but they ignore the defense of the deceased's negligence set up in the answer and proved by the testimony introduced by plaintiff and by defendant. State ex rel. v. Ellison, 270 Mo. 653.

*Thomas P. Burns* for respondent.

If the deceased Wilson were guilty of any negligence at all, it was small compared with the negligence of the conductor and engineer, and therefore at most only contributory negligence. Frese v. Railroad Co., 260 U. S. 1, 290 Mo. 501; King v. Ry. Co., 268 S. W. 409; Davis v. Kennedy, 266 U. S. 147; Union Pacific Railroad Co. v. Hadley, 38 Sup. Ct. Rep. 318; Copeland v. Hines, 269 Fed. 361; Pennsylvania Company v. Cole, 214 Fed. 948.

SEDDON, C.—This cause was reassigned to the writer for the expression of the opinion and conclusions of this court. The action is brought by plaintiff, as the administratrix of the estate of her deceased husband, Noah R. Wilson, for the benefit of herself and her two minor children, to recover damages because of his death, under the provisions of the Federal Employers' Liability Act of April 22, 1908. [U. S. Compiled Stat. 1918, secs. 8657-8665.] The deceased was a locomotive fireman in the employ of defendant railroad company, and was instantly killed in a head-on collision between two freight trains on defendant's railroad at or near a place called Hickory Hollow, between the towns of Laclede and Meadville, Missouri, on the evening of January 4, 1923. It was agreed by the parties to the action, on the trial, that deceased and defendant were both engaged in interstate commerce at the time, and that plaintiff was the duly appointed administratrix of her deceased husband's estate.

The ground of negligence of defendant charged in the petition is as follows:

"Plaintiff further and for cause of action states that on the 4th day of January, 1923, and for a long time prior thereto, the said Noah R. Wilson was in the service of the defendant, engaged in the operation of its said railroad as a locomotive fireman; that while so in the service of the defendant and on the 4th day of January, 1923, the defendant and its officers and agents ordered and directed the said Noah R. Wilson to fire one of its locomotive engines attached to one of its freight trains known as train No. 83, made up at Brookfield, Missouri, and destined to Kansas City, Missouri; . . . that while said Noah R. Wilson was so firing said locomotive engine and in the discharge of his duty to the defendant, the defendant and its officers and agents carelessly and negligently ran and caused to be run at a high rate of speed, its said freight train No. 83, on which said Noah R. Wilson was working, and another of its freight trains known as train No. third 72, together head-on at said point last above mentioned known as Hickory Hollow, between Laclede and Meadville in said Linn County, Missouri; that at the time of said collision said train No. 83 was going

westward and said train No. third 72 was going eastward on the same track of defendant's railroad; that by reason of said head-on collision between defendant's said freight trains, the said freight trains and the locomotives attached thereto were derailed and broken up and wrecked, and the said Noah R. Wilson was then and there caught in said freight trains and locomotives and wreckage and by reason thereof was mangled and injured, from which said injuries the said Noah R. Wilson then and there instantly died. . . .

"Plaintiff states that the said injuries and death of the said Noah R. Wilson were caused and brought about solely by reason of the carelessness and negligence of the defendant and its officers and agents in so negligently and carelessly running and causing to be run its said freight train No. 83 westward and its said freight train No. third 72 eastward toward each other and on the same track at the same time, so that said freight trains came together at high speed head-on, by reason of which, said trains and locomotives were derailed, broken up and wrecked and the said Noah R. Wilson was killed, when the defendant and its officers and agents knew, or by the exercise of ordinary care would have known, that said two freight trains were going at high speed toward each other on the same track and would come together and be broken up and wrecked and the said Noah R. Wilson would be thereby killed."

The answer admits deceased's employment and death, denies each and every other allegation of the petition, and pleads further:

"And for another and further answer to said first amended petition, defendant says the collision of the said trains No. 83 and 3rd No. 72 was caused by, and was the direct result of, the negligence of the said Noah R. Wilson in that said Noah R. Wilson then and there having knowledge, orders and instructions that the train upon which he was firing should wait upon the side track at the town of Laclede to meet 3rd No. 72, disregarded his said orders, instructions and knowledge and the said Noah R. Wilson then and there negligently caused and permitted said train No. 83 to move from the side track at Laclede onto and upon the main line and to proceed westward thereon in violation of its rights and contrary to his instructions and orders without any effort or action upon the part of him, the said Noah R. Wilson, to prevent said collision."

The reply denies specifically the several affirmative allegations, or defenses, of the answer.

The evidence shows that deceased entered defendant's employment in March, 1920; that he was employed intermittently as an extra fireman for about two years, being laid off at dull times, but that he had worked continuously from September, 1922, to the time of his death. On the evening of January 4, 1923, he was a member of a crew operating defendant's freight train No. 83, which left Brookfield, Missouri, a division point on defendant's railroad, at five o'clock P. M.,

west-bound for Kansas City. The crew consisted of the deceased fire-
man, Wilson, together with engineer Barclay, conductor Jones, head
brakeman Birmingham, and rear brakeman Mican. The train, No.
83, consisted of a locomotive and tender, thirteen or fourteen cars,
and a caboose. Extending west from Brookfield for about three and
a half miles there is a second track, lying south of the main track,
and known as the "south track." The south track connects with the
main track at a point called Needles, which is slightly less than two
miles east of the town of Laclede. There was no town or station at
Needles, but merely a switch leading on to the main track and a tele-
phone in a box fastened upon a telegraph pole. Laclede is the first
station west of Brookfield. Pursuant to a train order given at Brook-
field, train No. 83 proceeded west from Brookfield to Needles upon
the south track. The train No. 83, met four east-bound trains at
Needles, viz., first, third and fourth sections of train No. 68, and first
section of train No. 72. Upon leaving Brookfield, train No. 83 was
given a clearance card, to the effect that the block, or main track,
would be clear from Needles to Laclede upon the arrival at Needles of
third and fourth sections of train No. 68 and first section of train
No. 72. Having met the designated trains at Needles, train No. 83
proceeded west on the main track to Laclede, arriving at said station
at 5:35 P. M., where train No. 83 left the main track and proceeded
west upon the passing track, which lies directly south of the main
track, and stopped with the caboose opposite the depot. The depot
at Laclede is on the north side of the main track. The passing track
at Laclede lies south of the main track, and connects with the main
track about twenty car-lengths east of the depot and runs westerly
for nearly a half mile, where it again connects with the main track.

The evidence discloses that, in accordance with defendant's method
of operating its railroad, all trains were known and designated by
numbers, east-bound trains bearing even numbers and west-bound
trains bearing odd numbers. Even-numbered trains had the right
of way over odd-numbered trains of the same class, in the absence of
special train orders; in other words, east-bound freight trains were
superior to, and had right of way over, west-bound freight trains.
A rule of defendant required an inferior, or west-bound train, to
keep out of the way of opposing superior, or east-bound trains. The
two trains which collided were freight trains of the same class.
Trains are known as carded trains and "extras." Carded trains are
shown on the time card and have a regular and definite time schedule,
and the two trains which collided—No. 83 (west-bound) and No.
72 (east-bound)—were both carded trains, running upon a definite
time-table schedule. Trains are frequently run or operated in sec-
tions on the same time schedule, and each section of a train has equal
time-table authority, according to a rule of defendant. Another rule

of defendant provides: "All sections except the last will display two green flags, and, in addition, two green lights by night, in the place prepared for that purpose on the front of the engine." These signals, known as classification signals, mean that another section of the train, having identically the same rights and the same time-table schedule as the section of the train displaying such signals, is following. All trains are operated according to the time card, print-ed rules, and written orders and clearance cards. If an inferior, or west-bound, train has no written order to proceed against a superior, or east-bound train, the west-bound train must "work its way" (as expressed by certain witnesses), keeping out of the way of all east-bound trains, and all sections of any such trains.

Written orders and clearance cards are addressed, or directed, to the conductor and engineer of each train, and are written in dupli-cate, one copy being for the conductor and the other copy for the engi-neer. Before leaving the division point at Brookfield, conductor Jones of train No. 83 received from the station operator at Brook-field duplicate copies of a clearance card and a train order, to the effect that train No. 83 would meet the second section of train No. 72 at Laclede. Conductor Jones testified that he delivered one set of duplicate copies of the clearance card and the train order to engineer Barclay in person before leaving Brookfield. It appears that train No. 72 (east-bound) on the day in question was being run in four separate sections, designated as first, second, third and fourth sec-tions of No. 72. Under the clearance card and the train order deliv-ered to conductor Jones at Brookfield, and according to the printed rules of defendant, train No. 83 (west-bound), being the inferior train, was to meet the second section of train No. 72 at Laclede at 6:02 p. m., and to wait on the passing track at Laclede until the ar-rival of the later or following sections of train No. 72, unless a writ-ten train order received from the station operator at Laclede directed train No. 83 to proceed west on the main track. Upon the arrival of train No. 83 at Laclede, the conductor and the head brakeman of that train went to the depot and received from the station operator, one Hall, duplicate copies of a clearance card and a new train order at 5:40 p. m. The clearance card advised that the block, or main track, west of Laclede would be clear upon the arrival at Laclede of the second and third sections of train No. 72. The new train order di-rected train No. 83 to meet the fourth section of train No. 72 at Mooresville, a station west of Laclede. Conductor Jones retained one set of the duplicate clearance card and the new train order and handed the other set to head brakeman Birmingham, to be delivered by him to engineer Barclay of train No. 83. Conductor Jones testi-fied that the head brakeman started toward the engine of train No. 83 and, when last seen by him, had about reached the engine. Con-

ductor Jones did not see the head brakeman hand the duplicate clearance card and the train order to engineer Barclay, conductor Jones having stepped inside the caboose when Birmingham had about reached the engine. There was testimony that it was the duty of the head brakeman to hand the duplicate clearance card and the train order to the engineer, when ordered so to do by the conductor. After conductor Jones entered the caboose, train No. 83 was pulled to the west end of the passing track at Laclede to make room for a local freight train (coming from the north on an intersecting branch line) to back in at the east end of the passing track, so as to head out and proceed east on the main track to Brookfield.

About fifteen or twenty minutes after train No. 83 had been pulled to the west end of the passing track, the second section of train No. 72 (east-bound) arrived at Laclede from the west on the main track. The engineer of the second section of train No. 72 testified that his engine carried the classification signals prescribed by the printed rule—two green flags and two green lights displayed upon the front of the engine—thereby indicating that another and third section of train No. 72 followed, having the same rights and the same time schedule as the second section; that, when about 200 feet from the engine of train No. 83, the engine whistle of second No. 72 was sounded—one long and two short blasts—being the signal customarily used to call the attention of the crew of train No. 83 to the fact that the second section of train No. 72 was carrying signals for the third section, immediately following; and that the engine of No. 83 answered with two short blasts of the whistle, thereby indicating that the signals displayed and given by second No. 72 were received and understood by the engineer of train No. 83. These signals (if rightly understood by the engineer of No. 83) meant that train No. 83 must remain on the passing track at Laclede until the third section of train No. 72 arrived at Laclede. The engineer of second No. 72 testified further that, in order to identify his train, he called out to engineer Barclay of train No. 83, as he passed, ''second 72,'' holding up two fingers of his hand to indicate to engineer Barclay the number of the section. The engineer of second No. 72 also testified that he recognized engineer Barclay of train No. 83 as he passed the engine of that train, and that he saw another man on the other side of the cab of the engine of train No. 83, whom he supposed to be the fireman, and that he saw a third man, with a lantern, standing on the ground between the engine and the west switch of the passing track, whom he took to be the head brakeman of train No. 83. However, he recognized none but engineer Barclay. The engineer of second No. 72 was seated in the cab on the south side of his engine, and engineer Barclay was seated in the cab on the north side of the engine of train No. 83, so that the two engineers were contiguous to,

or directly opposite, each other in passing; in other words, the fire-men's seats in the engine cabs on the two trains were on the outer sides of the trains, while the engineers' seats in the engine cabs were on the inner sides of the trains. The conductor of train second No. 72 testified that, as the caboose of his train passed the engine of train No. 83, he held up two fingers and called to engineer Barclay of train No. 83, "Second 72," and heard engineer Barclay answer, "Number 83."

The second section of train No. 72 passed Laclede without stopping at 6:04 P. M., whereupon the station operator at Laclede notified the operator at Meadville (the next station west of Laclede) of the arrival at Laclede of the second section of train No. 72, and the latter operator thereupon gave the third section of train No. 72 a clearance, or right of way, over the main track from Meadville to Laclede. Train No. 83, without waiting for the arrival of the third section of train No. 72 at Laclede, and without a signal from conductor Jones to proceed, was pulled out upon the main track at Laclede and started west. The two trains—third No. 72 (east-bound) and No. 83 (west-bound)—met in a head-on collision on, or approaching, a curve in the main track between Meadville and Laclede, about four miles west of Laclede. Engineer Barclay, fireman Wilson, and head brakeman Birmingham of train No. 83, and the engineer of the third section of train No. 72, were instantly killed.

The station operator at Laclede testified that he did not know that train No. 83 had pulled out from the west end of the passing track at Laclede until the operator at Meadville called him and reported that a collision between two trains had occurred, and expressed a belief or suspicion that No. 83 must be one of those trains. Conductor Jones of train No. 83 testified: "Q. How soon after you got on the caboose was any movement of that train made? A. Well, just a short time they pulled to the west end" (of the passing track at Laclede.) "Q. What were you doing at the time that you pulled to the west end? A. I went in the caboose and sat down to do my book work. Q. Sat down at your desk and began to work? A. Yes, sir. Q. What were you doing while the train was standing out near the west end on the side track, of the passing track there? A. I was booking the train. . . . Q. Did you hear second 72 when it was coming? A. Yes, sir. Q. What did you hear in the way of signals given by second 72? A. I heard second 72 whistle signals to my engineer and I heard him answer. Q. And then what did you do? A. About the time the engine got up there I got into the cupola. . . . . Q. Then what did you do? A. I got down and went to finish my book, finish my reports. Q. And then what next attracted your attention? A. Nothing, only we pulled right out and left Laclede. Q. Had you given any signals or directions

to the engineer to pull out? A. No, sir; I was not outside. Q. And what was the first intimation you had that there was anything wrong? A. Nothing till I saw the headlight of the other train. Q. And how close were you then? A. Oh, we were right close. I could not say. It was just a few seconds. Q. Was it humanly possible in any way to have avoided that, when you discovered it, to have avoided the collision? A. No, sir, I don't think so. . . . Q. Mr. Jones, when the train 83 pulled out, could you have caused the engineer to stop if you had known there was something wrong? A. If I had known, if it ever entered my mind, I could have stopped immediately. Q. How would you do that? Suppose you had known then that a mistake had been made, how would you do it? A. Set the air. Q. You would set the air and that would stop him? A. Yes. Q. And you would have done that? A. Yes, sir. Q. It was purely an oversight that the train got out? A. Yes, sir. Q. You didn't notice the mistake until the collision, or about the collision? A. Yes, sir. That is the first intimation I had of it, was about the time they were going to hit. Q. The orders that you had, on close examination, would have shown that third 72 was where it turned out to be? A. Yes, sir. Q. If you had examined them carefully, you would have known that train was there? A. Yes, sir; I would never have left Laclede. Q. And the leaving was purely a mistake? A. Yes, sir. Q. Or an oversight? A. Yes, sir. Q. And you had these orders, just exhibited, in your possession when you started out, and when the collision occurred? A. Yes, sir. Q. And they are exact duplicates of the orders that you gave Mr. Birmingham? A. Yes, sir. . . . Q. Mr. Jones, a crew of a train in operation consists of the conductor, the engineer, the fireman and the brakeman, doesn't it? A. Yes. Q. Who is the highest man in authority in that crew in operating the train on the road? A. The conductor. Q. Who is the next in authority to the conductor? A. The engineer. Q. Is there anybody else as high in authority as either the conductor or the engineer? A. No, sir; unless they see an accident, and then anybody is. Q. How is that? A. Unless they would happen to see an oversight of the engineer or conductor. Q. And then everybody is? A. Yes. . . . Q. How far, Mr. Jones, did the train run from Laclede until the collision occurred? A. Well, about four miles, right in that neighborhood. Q. And during the run of that four miles you were in the cupola, were you, of the caboose? A. I was at the time it happened; yes, sir. Q. How long had you been up there? A. Well, I got up there when we were going across Locust Bottom. Q. And during the entire four miles, it never occurred to you that any mistake had been made? A. No, sir; it did not."

317 Mo. Sup.—42.

· The evidence tended to show that conductor Jones of train No. 83 had been a conductor on defendant's railroad for twenty-five to thirty years, and that engineer Barclay of that train had been an engineer on said railroad for at least fifteen years, and both were regarded as experienced and careful railroad men; that the person having highest authority on a train crew is the conductor, and the person next highest in authority is the engineer; and that the conductor and engineer, under printed rules of defendant in evidence, are made equally responsible for the safety and proper handling of the train. Rule 989 of defendant (for conductors) provided: "Make the safety of the train of the first importance in the discharge of duty. Should there be any doubt as to the right of road or safety of proceeding from any cause, consult the engineman and be equally responsible with him for the safety and proper handling of the train, and for such use of signals and other precautions as the case may require. Be vigilant and cautious, not trusting alone to signals or rules for safety." A correlative rule No. 969 (for engineers), identical in language with rule No. 989, required the engineer to "consult the conductor and be equally responsible with him for the safety and proper handling of the train, and for such use of signals and other precautions as the case may require."

Certain witnesses on behalf of plaintiff, employees of defendant, defined the duties of the fireman as follows: "The fireman is there to keep up steam and look after the water in the boiler, and watch out around the curves and see that there is no hot boxes on his side, and everything that he can help do he is supposed to do;" also, "his main duties are to comply with the engineer's instructions, to keep up the maximum steam pressure, watch after the water supply, and to see that he has the necessary tools and equipment on the engine before going out of a terminal, read all the train orders, clearance cards, and watch all train order signals, block signals, switches, take all signals given him on his side of the engine."

There was testimony that it was customary for the engineer to read the train orders and clearance cards to the fireman, or to deliver the same to the fireman to be read by him personally. One of defendant's engineers testified that, if the fireman was engaged in putting in a fire at the time of the receipt of train orders, the engineer allowed the fireman to finish his task of putting in a fire before reading the train orders. One of plaintiff's witnesses, an engineer, testified that it is the duty of the fireman to "call down" the engineer, if necessary to correct any oversight or mistake on the part of the engineer; that the fireman is "absolutely supposed to call him [the engineer] down if he should make any mistake, or anything like that; he [the fireman] is on there to make any suggestions; you are supposed to listen to any suggestions that he should make."

The evidence tended to show that, west of Laclede and between Laclede and Meadville, there is a short but very steep hill, known as Locust Hill, which must be climbed by west-bound trains such as No. 83, and that this hill is "about as high a hill as you have west of Brookfield," or between Brookfield and Kansas City, and requires the fireman to work harder in putting in a fire, and to shovel more coal, than usual. The location of Locust Hill is fixed by the testimony at three and one-half miles west of Laclede. It appears from the testimony of certain witnesses to have been customary for the fireman, when handed train orders while he is putting in a fire, to put the train orders in his pocket and to read the train orders after finishing firing. One of defendant's witnesses, who called himself a "special agent" (which we infer to be the defendant's designation of a rail- road detective), testified, in substance, that he arrived at the place of the collision about a half hour after the occurrence, and that he removed from the pockets of the four deceased employees their watches, money, keys and papers, and that he put such articles in separate pockets of his clothing; that he took from the pockets of the deceased fireman, Wilson, the duplicate set of clearance cards and written train orders delivered to conductor Jones of train No. 83 at Brookfield and Laclede. Respecting his identification of the body of the person from whose clothing he removed the clearance cards and train orders, he testified: "Q. Now, you took the property off of four men? A. Yes, sir. Q. And you made no note of it there, you made no record of it, you depended on your memory about where you put each man's property? A. Yes, sir; I didn't list it. Q. You depended on your memory? A. I put each man's stuff separately. Q. And there was no record made of it until January eighth (four days after the collision)? A. There was a record made of it that night when I got in, but those orders were so wet that I laid them out on my desk to dry them before I made any record of it. Q. Who made the record of it that night? A. I did. Q. And where is that record? A. Well, it is—just made it on a memo. Q. Where is that? A. Well, I suppose I tore that up. I don't know. Q. How long did you keep it? A. Well, I couldn't say to that. Possibly as soon as I wrote that note to Mr. Chittenden (defendant's superintendent at Brookfield) and attached to that, I throwed the other one in the waste basket. Q. From the time you took the effects off of these men until you made this memorandum, you had no record? You had nothing but your memory to guide you in fixing the ownership or the possession of these things, did you? A. Well, my memory of just a very short time. Q. And you emptied the pockets of four men? A. Yes, sir. . . . Q. You placed these orders in your desk when? A. That night. Q. How long did they remain there? A. Until the eighth. Q. Where is

that desk? A. In the depot at Brookfield. Q. And on the eighth you went back and got the orders, and where did you take them? A. After they dried I taken them to Mr. Chittenden's office.''

Certain printed rules of defendant were put in evidence, as follows:

''Safety is of the first importance in the discharge of duty. Obedience to the rules is essential to safety. To enter or remain in the service is an assurance of willingness to obey the rules. . . .

''34. The engineman and fireman must, when practicable, communicate to each other by its name the indication of all signals affecting the movement of their train.

''83. A train must not leave its initial station, or any division or subdivision, or a junction, or pass from double to single track until it has been ascertained whether all trains due, which are superior, or of the same class, have arrived or left.·

''84. A train must not start until the proper signal is given.

''210. Enginemen must show train orders to firemen and, when practicable, to forward trainmen. Conductors must show train orders, when practicable, to trainmen.

''939. Enginemen will . . . comply with the direction of the conductor as to starting, stopping and general management of trains, unless it endangers the safety of the train or requires a violation of rules..

''948. Read all rules, special orders and notices involving the movements or safety of trains and see that they are read and understood by the fireman.''

Under the title, ''Rules for Firemen,'' are the following:

''977. While engine is moving, keep a constant lookout when not engaged in firing. Be on watch if the engineman is obliged to look away from the track in front until he can resume his lookout. Give instant notice to the engineman of any signals or indication of danger or obstructions. . . .

''978. Carefully notice as far as practicable the position and indication of all fixed signals. Keep a sharp lookout also for signals carried by other trains, and keep in mind all orders and notices regarding the movement of trains so as to be prepared to correct any oversight or mistake if there should be any occasion for so doing.

''979. Be familiar with the rules for enginemen and observe how they are carried out. Observe rules for other classes of employees so far as they relate in any way to the proper discharge of the duties of a fireman.''

There was evidence that all employees of defendant, including firemen, were examined periodically to test their familiarity with, and knowledge of, the rules.

Defendant requested the giving of peremptory instructions, in the nature of demurrers to the evidence, at the close of plaintiff's case

and again at the close of all the evidence, which peremptory instructions were refused by the trial court. Instructions were given on behalf of the respective parties, presenting their respective theories of recovery or defense. The jury returned a unanimous verdict for plaintiff, assessing the damages in the sum of $13,000, upon which verdict the trial court entered judgment. After unsuccessfully seeking a new trial, the defendant was allowed an appeal to this court.

I.   Error is assigned in the refusal by the trial court of defendant's peremptory instructions. It is claimed that plaintiff, in order to establish defendant's liability, wholly relied upon the maxim, or doctrine, *res ipsa loquitur*, and made no attempt to prove negligence on the part of any agent or employee of defendant; in **Res Ipsa Loquitur.** other words, it is claimed that plaintiff submitted her case upon the mere showing that there was a collision between train No. 83 and the third section of train No. 72, and that her deceased husband was killed thereby. We do not so view the evidence. The evidence, much of which was adduced by defendant, clearly establishes that clearance cards and train orders, addressed to the conductor and engineer of train No. 83, were delivered in duplicate to the conductor, Jones, at Brookfield and Laclede; that the conductor was the employee highest in authority in the train crew and that the engineer was the employee next highest in authority; that the clearance cards and train orders, delivered in duplicate to conductor Jones, advised that train No. 83 must wait on the passing track at Laclede until the arrival of the second and third sections of train No. 72, which were running upon a definite time card schedule, with priority over west-bound trains such as No. 83; that correlative printed rules of defendant required that the conductor and engineer must each consult with the other, and each must be equally responsible with the other for the safety and proper handling of the train; that conductor Jones retained possession of a duplicate set of the clearance cards and the train orders; that (so conductor Jones testified) had he known of the mistake, if "it had ever entered my mind" (as he said), he could have immediately stopped the train by setting the air; that conductor Jones knew that train No. 83 had moved from the west end of the passing track at Laclede onto the main track, and was traveling west toward Meadville; that the conductor gave no signal to start the train, although the rules of defendant prohibited the starting of a train until the proper signal is given by the conductor; and that conductor Jones sat in the caboose while train No. 83 traveled west on the main track a distance of approximately four miles, and did nothing whatsoever to correct the mistake, or oversight, or misunderstanding of signals and orders, or plain carelessness (by whichever name it may be called), of the en-

gineer Barclay. Such evidence, in our opinion, clearly establishes negligence (nothing less) on the part of defendant, its agents and employees, and the proof clearly falls within the purview of the petition, which charged defendant, and its officers and agents, with "negligently and carelessly running, and causing to be run, its said freight train No. 83 westward and its said freight train No. third 72 eastward toward each other and on the same track at the same time, so that said freight trains came together at high speed head-on . . . when the defendant and its officers and agents knew, or by the exercise of ordinary care would have known, that said two trains were going at high speed toward each other on the same track and would come together and be wrecked." We see no reliance by plaintiff upon the doctrine *res ipsa loquitur* herein. Defendant did not see fit to stand upon its demurrer offered at the close of plaintiff's case, but elected to offer further evidence. Where defendant does not stand on demurrer at the close of plaintiff's evidence in chief, but puts in its own case, a final demurrer searches all the evidence to see if plaintiff's case was not aided by defendant's proof. [Stauffer v. Railroad, 243 Mo. l. c. 316; Lorton v. Railroad, 306 Mo. l. c. 137.]

It is strenuously contended by defendant that the duty imposed upon the deceased fireman, Wilson, to prevent his train leaving the passing track at Laclede before the arrival of train No. third 72, was "primary, entire and separate from and equal to, and independent of, that resting on any other employee;" that deceased

**Sole Cause.** manifestly violated such duty, the violation of which duty constituted direct or primary negligence on his part; and that such primary negligence of deceased must, as a matter of law, be deemed the *sole* proximate (and not a *contributing*) cause of his death. Defendant claims that, under the evidence herein, the deceased was required by the rules of the railroad company to be familiar therewith, and, hence, that he must be conclusively presumed to have known the rules; that such rules required him "to give instant notice to the engineman of any signals or indication of danger" and "to keep a sharp lookout also for signals carried by other trains, and keep in mind all orders and notices regarding the movement of trains so as to be prepared to correct any oversight or mistake if there should be any occasion for so doing;" that such duties imposed by the rules upon the deceased fireman are non-delegable, and afforded deceased no right to rely upon any other person or employee of defendant for his own protection; that he must be presumed to have read and known, and it was his positive duty under the rules to read and know, the directions contained in the clearance cards and train orders, and that the second section of train No. 72 carried signals indicating the third section of train No. 72 was immediately following, and therefore he must have known that train No. 83 had no right

to move from the passing track at Laclede onto the main track until after the arrival at Laclede of the third section of train No. 72; that it was his duty under the rules to "call down" the engineer Barclay and to correct any oversight or mistake of the engineer; that the deceased failed in all such duties, whereas, if he had performed such duties, the collision would have been averted; and that, therefore, his own negligence was direct and primary, and was not contributed to by any other member of the crew of train No. 83.

But assuming, for the purposes of defendant's argument, that deceased was negligent in the performance of his duties, nevertheless, the evidence clearly demonstrates that the conductor and engineer, who were deceased's superiors in authority in the operation and management of the train, were likewise both guilty of negligence, and that their negligence, in part, at least, was the cause of deceased's death.    Section 2 of the Federal Employers' Liability Act (U. S. Comp. Stat., sec. 8658) provides: "Every common carrier by railroad  .  .  .  shall be liable in damages to any person suffering injury while he is employed by such carrier  .  .  .  or, in case of the death of such employee, to his or her personal representative  .  .  .  for such injury or death *resulting in whole or in part from the negligence of any* of the officers, *agents, or employees* of such carrier  .  .  ." Section 3 of the same act (U. S. Comp. Stat., sec. 8659) provides that "the fact that the employee may have been guilty of contributory negligence shall not bar a recovery, but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee."

In Grand Trunk Western Railway Company v. Lindsay, 201 Fed. 840, 844, wherein the defendant railway company contended that the negligence of plaintiff switchman was the direct and sole proximate cause of his injury, but there was also evidence of negligence on the part of defendant and its employees, the Circuit Court of Appeals for the Seventh Circuit aptly and pointedly said: "If, under the Employers' Liability Act, plaintiff's negligence, contributing with defendant's negligence to the production of the injury, does not defeat the cause of action, but only lessens the damages, and if the cause of action is established by showing that the injury resulted 'in whole or in part' from defendant's negligence, the statute would be nullified by calling plaintiff's act the proximate cause, and then defeating him, when he could not be defeated by calling his act contributory negligence.    For his act was the same act, by whatever name it be called.    *It is only when plaintiff's act is the sole cause— when defendant's act is no part of the causation—that defendant is free from liability under the act.*"    (Italics ours.)    The Supreme Court of the United States, on writ of error, affirmed the judgment of the Court of Appeals, and quoted its language aforesaid with ap-

proval. [Grand Trunk Western Railway Company v. Lindsay, 233 U. S. 42, 47.]

In a later case under the Employers' Liability Act (Union Pacific Railroad Company v. Hadley, Administrator of Cradit, 246 U. S. 331, 333) wherein Cradit, a brakeman, was killed in the collision of two trains, and it was shown to be the duty of Cradit to give warning of his standing train to another train approaching from the rear of the standing train, and it further appeared that he would have escaped death had he been at his post of duty, the Federal Supreme Court said: "But it is said that in any view of the defendant's conduct the only proximate cause of Cradit's death was his own neglect of duty. But if the railroad company was negligent it was negligent at the very moment of its final act. It ran one train into another when if it had done its duty neither train would have been at that place. Its conduct was as near to the result as that of Cradit. We do not mean that the negligence of Cradit was not contributory. We must look at the situation as a practical unit rather than enquire into a purely logical priority. But even if Cradit's negligence should be deemed the logical last, it would be emptying the statute of its meaning to say that his death did not 'result in part from the negligence of any of the employees' of the road. [Act of April 22, 1908, c. 149, sec. 1, 35 Stat. 65.]"

In Pennsylvania Co. v. Cole (Cir. Ct. Appeals, 6th Cir.), 214 Fed. 948, 950, plaintiff, a rear brakeman, while asleep in a caboose, was injured in a collision with a following train, and there was evidence that markers, or danger signal lamps, were burning on the rear of the caboose of the train on which plaintiff was riding, and that the operatives of the following train were negligent in failing to discover the preceding train in time to avoid the collision. In affirming a judgment for plaintiff, that court said: "But it is strongly pressed upon us that plaintiff's negligence in going to sleep in the caboose while on duty, and thus in failing to flag the following train, was negligence so gross and so proximate in its effect as to preclude all right of recovery. . . . There can be no doubt, at the common law, such would have been the effect of plaintiff's alleged negligence; but the Employers' Liability Act expressly abrogates the common-law rule under which action was barred by the negligence of the plaintiff proximately contributing to the accident, and substitutes therefor the rule of comparative negligence. Under this act, no degree of negligence on the part of the plaintiff, however gross or proximate, can, as matter of law, bar recovery; for, as said in Norfolk & W. Railway Company v. Earnest, 229 U. S. 114, 122, the direction that the diminution shall be 'in proportion to the amount of negligence attributable to such employee' means that: 'Where the causal negligence is partly attributable to him and partly to the

carrier, he shall not recover full damages, but only a proportional amount bearing the same relation to the full amount as the negligence attributable to the carrier bears to the entire negligence attributable to both.' ''

We have given thoughtful study and consideration to the cases cited by defendant in support of its position—Great Northern Ry. Company v. Wiles, 240 U. S. 444; Frese v. Railroad Co., 290 Mo. 501; *Idem*, 263 U. S. 1; Davis v. Kennedy, 266 U. S. 147; Yadkin Railroad Company v. Sigmon, 120 S. E. 56; *Idem*, 267 U. S. 577; and M. K. & T. Railway Co. v. Collier, 157 Fed. 347—but an analysis of those cases convinces us that the facts upon which the cited opinions were predicated differentiate those causes from the case at bar. In the Wiles case, wherein plaintiff's intestate was a rear brakeman riding in the caboose of a freight train and was killed by the collision of a following train with the caboose of the standing train, it was shown by the proof that deceased brakeman failed in his duty, prescribed by the rules of the railroad company, to protect his train by giving warning to the following train, but it was also shown that the engineer of the following train did not know of the existence of the freight train, wherefore no negligence was attributable to him; hence, it was not shown in that case that the negligence of any other employee of defendant than the deceased, "in whole or in part," caused his death. In the Frese case, an action under the Employers' Liability Act to recover damages for the death of a locomotive engineer in a collision between his train and a train of another railroad at an intersecting crossing, a statute of Illinois made it the personal duty of the engineer, and of no other employee, positively to ascertain that the way was clear before proceeding over the railroad crossing, and hence it was ruled that his death was not caused "in part" by the negligence of any other employee of defendant railroad. In the Kennedy case, recovery was denied under the Employers' Liability Act for the death of an engineer who was killed in a collision with an approaching train, upon the ground that it was the personal duty of the engineer to ascertain whether the other train had passed, and his duty was primary, because he alone had the physical control of the train and was himself managing its course. The Sigmon case was likewise ruled upon facts identical with, or closely similar to, the facts in the Kennedy case. The Collier case was ruled prior to the enactment of the Federal Employers' Liability Act, and when, at common law, contributory negligence of the plaintiff was a complete bar to an action for his injuries. In that case, it appeared from the personal testimony of plaintiff, a locomotive fireman, that he himself saw there was no light displayed at a switch stand, under which circumstance a rule of defendant required that the absence of a signal light must be regarded as a stop signal, yet he proceeded

thereafter to fire his engine without reporting the absence of the signal light to the engineer, and knowing that the engineer was not taking heed of the absence of the switch light by slowing up the speed of the engine; hence, it was ruled that plaintiff was barred from recovery for his injury, caused by the engine running into an open switch, because of his own contributory negligence.

In the case at bar, the deceased fireman, Wilson, did not have physical control of the train No. 83, nor was he managing its course, for the proof tends to show that his superiors, the conductor and the engineer, were highest in authority of the train crew, under the rules of defendant, which made the conductor and engineer "equally responsible for the safety and proper handling of the train." We are convinced that defendant's peremptory instructions were rightly refused by the trial court, and appellant's assignment of error must be denied.

II. Error is assigned in the giving of plaintiff's instructions numbered 1, 2 and 3. Instruction No. 1, among other hypothesized facts, required the jury to find and believe "that, while said Noah R. Wilson was firing said locomotive pulling said train No. 83, the defendant and its officers and agents carelessly and negligently ran and

**Instructions: Contributory Negligence.**
caused to be run its said freight train No. 83 westward and another of its trains, to-wit, its freight train No. third 72, eastward on the same track at the same time so that said freight trains came together head-on at a point known as Hickory Hollow, near Hickory Branch, between Laclede and Meadville, in Linn County, Missouri, and that by reason of said collision head-on between said trains the said Noah R. Wilson was killed, and (if you) further find that the said Noah R. Wilson was not guilty of any negligence contributing in any wise to his death, then your verdict should be for the plaintiff, but in no event to exceed $50,000."

Instruction No. 2, on the measure of damages, told the jury: "But if you find that deceased was guilty of negligence contributing to his death and that defendant and its officers and agents were also guilty of negligence contributing to his death, then you should be governed in your finding by instruction number three."

Instruction No. 3 reads: "The court instructs the jury that if you believe and find from the evidence that defendant was guilty of negligence as defined in these instructions; and if you find that Noah R. Wilson was also guilty of negligence, as defined in these instructions, which partly contributed to his death, if any, the plaintiff cannot recover the full damages sustained by plaintiff, but only such a proportional amount bearing the same relation to the full amount

as the negligence attributable to the defendant bears to the entire negligence attributable to both deceased and defendant."

It is urged that Instruction 1 does not conform to the charge of negligence made in the petition and does not conform to the evidence limited to such charge. A comparison of the instruction and the allegations of the petition demonstrates to our minds that the instruction submitted to the jury the hypothesized facts constituting the precise charge of negligence made in the petition. As we have heretofore said in this opinion, the evidence of the negligence of defendant and its employees was within the purview of the allegations of the petition and was sufficient, in our opinion, to establish the negligence pleaded. We conclude, therefore, that the Instruction 1 is within the purview of both the pleadings and the evidence.

It is also claimed that Instruction 1 permitted the jury to find that "Noah R. Wilson was not guilty of any negligence contributing in any wise to his death," whereas the proof manifestly shows that deceased was negligent as a matter of law in failing to "call down" the engineer Barclay, and thereby "to correct any oversight or mistake" on the part of the engineer; furthermore, it is claimed that instructions numbered 2 and 3 allowed the jury to find that deceased was guilty of contributory negligence, whereas Instruction 1 allowed the jury to find that he was not guilty of contributory negligence, and therefore Instructions 1, 2 and 3 are conflicting and misleading, and were confusing to the jury. Defendant argues that the evidence shows that defendant knew, or must have known, of the directions contained in the train orders, because they were found in his pocket after the collision; that he must have heard the whistle signals given by the engine of the second section of train No. 72, signifying that it was displaying classification signals showing that the third section of that train was immediately following; and that he must have seen, because it was his duty to see, the classification signals displayed upon the front of the engine of train No. second 72. It was shown by the testimony of certain of plaintiff's witnesses that, if the fireman was "putting in a fire" at the time the train orders were delivered to the engineer, it was customary for the engineer to allow the fireman to finish firing the engine before reading the train orders; that, a short distance west of Laclede, a steep hill is encountered, making it necessary for the fireman of a west-bound train to work harder in putting in a fire, and to shovel more coal than usual, in order to keep up sufficient steam pressure to carry the train over the hill; and that the fireman, if engaged in firing the engine, ordinarily put the train orders in his pocket and read them after the firing was completed. Furthermore, we think that the testimony of the so-called "special agent" of defendant, to the effect that he found the clearance cards and the train orders in the

pocket of the deceased fireman is not conclusive of the fact that deceased had them in his possession, for the credibility of the "special agent," like that of any other witness, was a matter for the jury, and the jury may have believed that the "special agent" might have been mistaken in stating that he had removed the train orders from the pockets of deceased (inasmuch as the witness testified that he made no record of the matter at the time, but trusted solely to his memory), or the jury may have entirely disbelieved the testimony of the witness and given no credence thereto, as was their province.

We cannot say, as a matter of law, that the evidence herein convicted deceased of contributory negligence, but we are of the opinion that whether he was guilty of negligence contributing to his injury was a question of fact for the jury. Whether deceased read and knew the contents of the train orders; whether he heard the whistle signals of train No. second 72; and whether he saw the classification signals displayed by the engine of the second section of train No. 72, are all mere matters of surmise, so far as the proof herein discloses. As a general rule, the burden of proving contributory negligence rests on defendant (29 Cyc. 601), and we do not understand that this general rule is abrogated, or modified in any degree, by the Federal Employers' Liability Act. The burden therefore rested upon defendant to establish by proper proof, that deceased was negligent, and such fact cannot be established by mere surmise.

In St. Louis & San Francisco Railroad Company v. Bishard, 147 Fed. 496, 498, plaintiff's intestate was a locomotive fireman, who was killed when a fast passenger train, called the "Meteor," ran at high speed through an open switch from the main track onto a sidetrack and was derailed. The action was under a Kansas statute to recover damages for the death of the fireman, and was brought prior to the enactment of the Employers' Liability Act, so that contributory negligence of deceased was a complete bar (under the Kansas statute) to an action to recover damages for his death. Said the Federal Circuit Court of Appeals, 8th Circuit, speaking through HOOK, Circuit Judge: "The company claims that, as the switch was thrown for the passing track, the lamp, if burning, must have shown the red sign of danger, and that if it was not burning when the Meteor approached, the mere absence of a light at that customary place was in itself a sufficient warning under a rule of the company to that effect. Here arises the principal contention of contributory negligence on the part of the fireman. It is said that it was his duty, especially in approaching stations, to keep a lookout for signals, and that as his train was moving on the curve his position on the west side of the engine would have enabled him to look along the chord of the arc and to detect either the presence of the red light at the switch stand or the absence of any light, as the case may have been, and that in either

event it was his duty to immediately notify the engineer of the result of his observations. . . . There were other important and imperative duties which the fireman was required by the rules of the company and the nature of his position to perform. Those rules expressly placed him under the supervision and direction of the engineer and required him to obey the orders of the latter respecting the performance of his duties. In keeping a lookout on the track for signals he was merely an assistant acting under the direction of the engineer, and it cannot be said that upon the occasion in question it was his paramount duty to be on the lookout at any particular moment. The rules did not so provide, and we cannot infer that the engineer so ordered. Other duties of moment may have demanded his attention elsewhere. Having due regard to that presumption which obtains in the absence of evidence, a court would not be justified in declaring from the record before us that the deceased was not, during the approach of the Meteor, engaged in the performance of some duty of his position or of some order of the engineer that prevented him from observing either the presence or absence of a red light at the switch stand. . . . Nor can we assume, in the absence of evidence, that, if the fireman was on the lookout and observed that there was no light at the switch stand, he did not seasonably notify the engineer who was in charge of the engine. It is not necessary for us to determine in this case whether the engineer was or was not remiss in the performance of his duties. Even if he was, it does not follow that his negligence is imputable to the fireman or that the right of the latter or his personal representatives to recover for the injury so caused is in any wise impaired thereby. The negligence of the engineer, if there was such, cannot be visited upon the fireman unless he concurred therein, and there must be proof, not mere surmise of such concurrence. . . . The evidence as to the conduct of the fireman, whether negligent or not, presented a fair question for the determination of the jury and they found against the contention of the company. The trial court was right in refusing to direct a different conclusion.''

For aught that appears in the record in the instant case, the deceased fireman may have fully complied with his duties, under the rules of defendant, and attempted ''to correct any oversight or mistake'' on the part of engineer Barclay by calling his attention to the train orders and classification signals, and deceased also may have remonstrated with, or ''called down,'' the engineer when he moved train No. 83 from the passing track onto the main track and proceeded westward toward Meadville without awaiting the arrival at Laclede of the third section of train No. 72. Under such circumstances, there were but two courses of action left open to the deceased fireman; either he must have wrested control of the engine

from his superior, engineer Barclay, by main force and violence, or he must have deserted his post of duty in firing the engine and jumped from the engine. In our judgment, deceased was not called upon to take either such action in order to absolve himself from the charge of negligence on his part. It was a question of fact for the determination of the jury whether deceased was guilty of any negligence contributing to his death. Under the Employers' Liability Act, if the jury found and believed that deceased was not guilty of any negligence contributing in any wise to his death, then plaintiff was entitled to recover her full damages; if, on the other hand, the jury found and believed that deceased was guilty of negligence contributing to his death, but that defendant and its agents and employees were also guilty of negligence directly contributing to his death, plaintiff was nevertheless entitled to a recovery, but the damages must be diminished by the jury in proportion to the amount of negligence found to be attributable to the deceased. Plaintiff's instructions numbered 1, 2 and 3 properly charged the jury in that respect, and cannot be held to be conflicting, or misleading and confusing to the jury. The instructions are couched in language which has been approved by the Federal courts. [Railway Company v. Earnest, 229 U. S. 114, 122; Pennsylvania Company v. Cole, 214 Fed. 948, 951.]

It is said that plaintiff's Instruction 1 submitted a question of law to the jury, in that it permitted the jury to determine whether the hypothesized facts constituted negligence on the part of defendant, and its employees, without telling the jury what acts, or facts, constitute negligence in law on the part of defendant. If the instruction may be said to be subject to criticism in that respect, nevertheless we do not regard the giving of such instruction as reversible error when viewed in the light of defendant's given instructions, and treating all of the given instructions as one whole and entire charge to the jury.

Finding no reversible error upon the record herein, and no complaint having been made by appellant as to the amount of the verdict and judgment, it follows that the judgment *nisi* must be affirmed. It is so ordered. *Lindsay* and *Ellison, CC.,* concur.

PER CURIAM:—The foregoing opinion by SEDDON, C., is adopted as the opinion of the court. All of the judges concur, except *Gantt, J.,* not sitting.