NELLIE M. SMITH, Administratrix of Estate of JAMES A. SMITH, v. CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY, Appellant. —15 S. W. (2d) 794.

Division One, February 1, 1929.

*Luther Burns, Henry S. Conrad, L. E. Durham* and *Hale Houts* for appellant.

962

*Pross T. Cross* and *Gerald Cross* for respondent.

ELLISON, C.—The plaintiff's deceased husband, the intestate, was a section foreman on the main line of the defendant C., B. & Q. Rail-

road Company, running through the village of Chandler in Clay County, and used in interstate commerce. Under a leasing arrangement trains of the Rock Island Railroad are run over this line. While working on the track at a curve near Chandler about three o'clock in the afternoon of June 21, 1923, the deceased was struck and killed by a southbound Rock Island passenger train. The plaintiff brought this suit in the Circuit Court of Caldwell County under the Federal Employers' Liability Act. On defendant's application the venue was changed to De Kalb County, where a trial resulted in a verdict for plaintiff, which was set aside by the court as being against the weight of the evidence. On the second trial the verdict was for $8000. From the judgment on that verdict the defendant has appealed.

The respondent submitted her case on only one charge of negligence, viz., that her intestate's fatal injuries were caused by running the train around the curve without sounding the whistle, in violation of the appellant railroad's operating rule No. 920. The sole assignment of error made by appellant is that its demurrer to the evidence should have been sustained because: (1) the rule was not applicable under the facts of this case; (2) the acts of the deceased were the sole proximate cause of his injuries. The rule is as follows:

"Road crossing whistle must be sounded before passing around curves where the view is obscured, between the hours of 6:30 A. M. and 6:30 P. M."

There were five men in the section crew, counting the deceased. They were raising and filling in the track a short distance north of a highway crossing a few hundred yards above the railroad station at Chandler. At that point the railroad runs southerly on a long curve veering west. According to the testimony of appellant's civil engineer the curve begins "about 400 feet" north of the crossing, but a blue print map drawn to scale by this same engineer and introduced in evidence by appellant shows the north point of the curve is 530 feet above the crossing, and we take this latter distance as correct for the purposes of the demurrer. The curve continues south of the crossing for at least 1100 feet, which is as far as the map shows. North of the north end of the curve for more than 1000 feet the track runs straight to a point where there are two semaphores.

Following the course of the main track and about nine feet east thereof is a switch track which extends clear around the curve and even further north. A little above the highway crossing the roadbed runs through a cut. The embankments on each side, with vegetation growing thereon, were as much as fifteen feet high at the highest point. There were also some trees along the sides of the right of way. The evidence does not show the conditions as to visibility south of the place of the accident, except, of course, the depot on the west side of the tracks.

The hotly contested issues of fact at the trial below were as to just where the men were working when the deceased was struck, how far the train could be seen from that place, and what the deceased was doing at the time. If we were passing on the weight of the evidence some of the testimony on both sides would be open to question because of prior contradictory statements and for other reasons. But since the determination of such matters rarely comes within our province in cases at law, and a jury has twice passed on the issues of fact, the appellant rightly concedes in its brief we must take the testimony at its face value for the purposes of the demurrer. So we shall limit ourselves, in the main, to setting out the substance of the evidence.

The only eyewitnesses to the casualty were the four section men. Three of these testified for appellant and one for respondent. The evidence for appellant was that the train struck the deceased at a point on the main track 150 to 200 feet north of the highway crossing. The respondent's witness Kurfman fixed the distance at seventy-five or eighty feet, and was corroborated in this by the testimony of a farmer named Archer, who said he went to the scene immediately after the accident and that the intestate was lying within 75 feet of the crossing; and one of appellant's witnesses admitted the deceased fell just about where he was hit, i. e., that the train did not carry him forward.

The three section men who testified for appellant all said that just before the train passed the deceased was sitting on the west rail of the passing track facing west—that is, facing the main track where the men were at work. His head was bowed over resting on his arms as they lay across his knees, as if he were dozing. The three men heard the train whistle for the station, nearly a mile up the road, and as it drew near going forty or fifty miles per hour they stepped aside. But the deceased apparently was not aware of its approach until it was close, when he jumped up in confusion and ran toward the main track. Then, realizing he was heading directly into danger he attempted to turn, but it was too late; the pilot beam of the locomotive struck him.

The respondent's witness Kurfman agreed the deceased had been sitting on the passing track rail, as stated by the other witnesses, but at both trials he declared before the train came the deceased arose from that position and went over to the main track where he was sighting down a rail with his back to the north when the locomotive bore down on him from behind going fifty or sixty miles per hour. At the first trial his testimony was that the deceased had stepped over to the main track about a minute before the train came; at the second trial he said he heard the rumbling of the train and looked around and saw the deceased standing on the east rail of the main

line, "and as I jumped and got out of the way, about that time the train hit Smith" (the deceased).

The train which struck the intestate was a regular train that did not stop at Chandler. It was running about five minutes late. The deceased had worked for the appellant about five years and was familiar with its rules, and presumably its train schedules. The engineer saw the section crew near the track, but neither he nor the fireman knew the deceased had been hit until they reached Kansas City. Their testimony was, therefore, of little value in direct explanation of the casualty. It was admitted by appellant the train did not whistle for the curve, and affirmatively shown the custom was not to do so; but the train crew all said the station whistle was sounded about a mile back and that the train whistled for the crossing. The whistling post for the crossing was up by the semaphores, closer to the crossing than where the whistling would have begun if the whistle had been sounded for the curve as directed in the rule. But the three section men and several other witnesses denied the crossing whistle was sounded, at least they did not hear it; and the latter witnesses did not hear the station whistle.

On the specific issue as to how much, or how far, a view of the train was obscured by the curve, the evidence was conflicting. The appellant conceded the view did not extend from one end of the curve to the other, but by the testimony of four witnesses it was shown a train could be seen for nearly 1500 feet, clear up to the semaphores, from points on the main track sixty-six feet or more north of the highway crossing—and it will be recalled the respondent contended the deceased was seventy-five feet north of the crossing when struck. According to the testimony for respondent the range of view was much shorter. One of her two witnesses on the question said that to a person standing on the main track seventy-five feet north of the crossing a southbound train would be hid from view until within 675 feet; and the other witness fixed the distance at 500 to 600 feet. This shortest maximum view of 500 feet would therefore extended 575 feet north of the crossing, or forty-five feet north of the north point of the curve, which was 530 feet north of the crossing; and if the point of the curve was only 400 feet north of the crossing, as appellant's engineer estimated, the view would reach 175 feet beyond it.

The appellant introduced eight photographs and the respondent two; but none of the appellant's photographs looking north were taken from the main track. In all of them the camera was set at points north or east of the place designated by respondent as the place of the accident, and in consequence they commanded a better view of the track around the shoulder of the curve. In addition some of them were taken in early spring before the vegetation had grown up. One of respondent's pictures was taken from the spot

where she says the deceased was hit, but it was an enlarged kodak picture and the objects in deep background are not at all clear. There is nothing in the pictures substantially altering the issue as made by the oral testimony of the witnesses.

I. If we understand correctly the appellant's first proposition it is that under all the evidence the curve was not one where the view was obscured within the meaning of rule 920, and for that reason whistling was not required. The contention is premised  on the "clear track doctrine" often announced by this court that section men are obliged to look out for their own safety and as to them an engine crew have a right to expect a clear track. [State ex rel. Lusk v. Ellison, 271 Mo. 463, 468, 196 S. W. 1088, 1089.] From this it is argued that when a curve permits section men at any point on it to see a train in time to protect themselves, the operating rule does not apply, even though the view does not extend from one end of the curve to the other; and it is insisted the distance of 500 feet, shown by the evidence most favorable to respondent to have been the range of the intestate's view, was as a matter of law sufficient for the section men's protection.

There are several reasons why we cannot approve this theory. In the first place there is no evidence that at *any* point on the curve the section men could have seen the train for 500 feet. All the testimony dealt exclusively with the question as to how far the train could have been seen by the deceased from *where he was* (according to the testimony for each litigant) just before the accident—and thence northward. There was no showing as to the view from points along the track south of the place of the accident—or at least south of a point sixty-six feet north of the highway crossing, that being the southernmost point mentioned in this connection.

It is true the appellant's blue print shows the track described a uniform curve, but it does not follow that the view would be the same all the way around. It was the embankments on the west side with the vegetation growing thereon, the buildings, trees, etc., and their proximity to the track, that obstructed the view; and what the conditions were with respect to these things along the 1100 feet or more of curved track south of the highway crossing, the record does not disclose.

Another valid objection to appellant's contention is that we have no right to say as a matter of law a maximum view of 500 feet was sufficient to protect the trackmen. The respondent's witnesses say the train was going fifty or sixty miles per hour in this instance. That would be 73⅓ to eighty-eight feet per second, and allowed only six or seven seconds for the men to get out of the way, assuming they saw the train the very instant it came into view. In Dixon v. C. &

A. Ry. Co., 109 Mo. 413, 428, 19 S. W. 412, 416, where the employee was safeguarded by an operating rule similar to the one in evidence here, he could see the train for a distance of 1035 feet and for a space of thirty seconds; and in Hunt v. C., B. & Q. Railroad Co., 303 Mo. 107, 117, 122, 259 S. W. 481, 483, 485, for a distance of 800 feet; and yet in both of these cases it was held the engine crew were bound to sound the whistle in accordance with the rule.

Again, the appellant's position is not tenable because it is contrary to the ruling in Dixon v. C. & A. Ry. Co., supra (109 Mo. l. c. 415, 19 S. W. l. c. 413) which was decided by the court en banc, that "an obscure curve is one in which a train at one end cannot be seen from the other end;" and it is conceded that such was the fact in this case. Strictly speaking, it must be admitted this pronouncement in the Dixon case was not a part of the opinion proper, because it appeared in the statement of facts which was separate from the opinion, yet since the opinion proceeded on that theory and basis, we must regard the decision as controlling.

Appellant suggests this Dixon case ought not to be accepted as an authority here because the rule there under consideration required whistling "at all obscure curves" whereas the rule in the case at bar specifies curves "where the view is obscured." It is said there is a difference between an obscure curve and one where the view is obscured; that the former expression refers to a curve as a whole whereas the latter applies only to conditions of visibility at particular places on the curve. We cannot draw such a distinction. The clause "where the view is obscured" in the instant rule refers to the whole curve just as did the adjective "obscure" in the other; and both designate the curves for which the whistle must be sounded.

A further effort is made to distinguish the Dixon case by pointing out that in that case the curve under consideration was conceded to be obscure and the defending company had put its own interpretation on its rule and made it applicable by following a custom of whistling there, whereas, in the present case there was no such admission, and the custom was *not* to whistle. This may have been because it was necessary to whistle for the *crossing* at about the same place; but whether this is so or not, custom cannot change cold type. The rule is not ambiguous as regards the duty of whistling, and its construction is for the court. [Stuart v. Dickinson, 290 Mo. 516, 555, 235 S. W. 446.]

As a practical matter, we think the holding in the Dixon case is right. The rule says the *"road crossing whistle* must be sounded *before* passing around curves where the view is obscured."* (Italics ours.) Under our statute, Section 9943, Revised Statutes 1919, a crossing whistle must be sounded at intervals for eighty rods until the train shall have passed the crossing. From this it is evident that the duty to whistle arises well before a train has reached the curve,

or at least the obscured part of it, and that the engineer cannot know what situation he will encounter—unless he can see clear through to the other end. The trackmen's range of view may vary at different places on the curve, and what would be a safe distance for one operation might not be for another. The intent of the rule can hardly be that the engineer may speculate on these matters, and then, taking into consideration the speed of the train and weather conditions, determine in advance whether whistling is necessary. Such a lack of uniformity in operating practice would tend to confuse the trackmen rather than to assist them.

II. It is next contended that even though the engineer should have whistled, yet the deceased was not entitled to the benefit of the rule, and his representative, the respondent, cannot invoke a breach of it, because the deceased could see up the straight track north of the curve for 175 feet according to the testimony of appellant's witness, and for at least forty-five feet by respondent's own showing. This contention, likewise, has its basis in the clear-track doctrine heretofore mentioned and is further founded on cases like Degonia v. St. L., I. M. & S. Ry. Co., 224 Mo. 564, 592, 123 S. W. 807, 818, which hold a section man has no right to rely on the giving of the statutory crossing signals because he is bound to look out for himself and the signals are intended for people in other situations. The argument is made that since the deceased could see the straight track he was working under the clear-track doctrine and therefore by analogy could not count on the curve signals.

If a section man be struck by a train while working on straight track close to a curve where whistling is required, it may be true he could not complain of a breach of the rule, though he might have got out of the way if the signal had been sounded; as so, also, if he were barely on the curve, where, to all intents and purposes, his view would be equally good—to go along with appellant as far as possible we mention these questions *arguendo* without attempting to decide them—but it certainly is not true that he is denied the protection of the rule merely because he can see *some part* of the straight track, however small.

Whatever may be the effect of this salutory operating regulation in other situations that can be imagined, we think it evident, and hold, that when the curve is one for which the signal ought to be given, trackmen there engaged may rely upon a compliance with the rule if their view is substantially obstructed or obscured by the curve, though not wholly so. This we conceive to be in line with the thought underlying earlier decisions. [Dixon v. C. & A. Ry. Co., supra; Hunt v. C., B. & Q. R. R. Co., supra, 303 Mo. l. c. 124, 259 S. W. l. c. 486; Hughes v. M. R. & B. T. Ry., 309 Mo. 560, 581, 274 S. W. 703,

710; Kidd v. C., R. I. & P. Ry. Co., 310 Mo. 1, 32, 274 S. W. 1079, 1089.] It is needless to add that the evidence supported a finding for respondent under the law as here declared.

III. The third point made by appellant is that the acts of the deceased were the sole proximate cause of his fatal injuries. This assignment as elaborated in the brief is based largely on grounds heretofore discussed: that the engine crew were under no duty to whistle, or to discover deceased on the track; and since they did not actually see him, his injuries and death must be charged to his own acts in going to and staying on the track. We have already disposed of the propositions on which this argument is predicated.

The further contention is that even if the engineer was negligent in failing to whistle for the curve yet the acts of the deceased in suddenly going from a place of safety on the switch track to a place of danger on the main track, and there remaining with his back to the engine, were not such consequences of the engineer's negligence as the latter reasonably was bound to anticipate, but were the independent and intervening sole proximate cause of the accident. There appears to be no merit whatever in this suggestion. Considering the object and purpose of the warning signals was it not at least a jury question whether the deceased would have gone in front of the train at all if the whistle had been sounded? A number of cases are cited in the brief but they are so dissimilar in their facts that it will do no good to refer to them.

If it were our duty to pass on the credibility of the witnesses and the weight of the evidence there would be some serious questions in the case, but on the record and under the law the judgment should be and is affirmed. *Lindsay* and *Seddon, CC.,* concur.

PER CURIAM:—The foregoing opinion by ELLISON, C., is adopted as the opinion of the court. All of the judges concur, except *Frank, J.,* not sitting.