TENNIE BROCK, Administratrix of the Estate of WM. BROCK, v. MOBILE & OHIO RAILROAD COMPANY, a corporation, Appellant.— 51 S. W. (2d) 100.

Division One, June 13, 1932.

*R. P. & C. B. Williams* for appellant; *Carl Fox* of counsel.

*C. O. Inman* for respondent.

FERGUSON, C.—This is an action for damages for the death of Will Brock, a section foreman employed by defendant. Brock was killed in a collision between a motor car used by the section crew, and one of defendant's trains near Berkley, Kentucky. His widow, Tennie Brock was appointed Administratrix and instituted this action in the Circuit Court of the City of St. Louis under the Employers' Liability Act. Plaintiff had verdict and judgment for $10,000 and defendant appealed.

Brock was foreman of a section crew employed in the maintenance of defendant's track on a section, about six miles in length, extending north and south from the town of Berkley, Kentucky. This is a single track and a part of defendant's main line over which it operated trains in interstate commerce. The section crew traveled to points where work was to be done on a motor car propelled by a gasoline engine. The railroad track at Berkley runs north and south. North from Berkley the track crosses two trestles, runs through deep cuts and curves to the northwest and then to the northeast The two trestles are about 600 feet apart and between them the track runs in a cut. The north trestle, at the north end of which the collision occurred, is referred to in the evidence as the second trestle. This trestle is about 100 feet long and at the highest point is about thirty-five feet above the ground. About 200 feet north of the north end of the second trestle the track curves sharply to the northeast through a deep cut and around a high embankment on the east side thereof This northeast curve around the embankment is about 800 feet in length. On the morning of the collision the section crew composed of eight men, including the foreman Brock, left Berkley sometime after seven o'clock, on the motor car, for Laketown, a town four miles north of Berkley, to lower a boiler at the pumping station there. Defendant's southbound train No. 15 was scheduled to pass Berkley at four o'clock A. M. but on this morning was running late and had not passed Berkley at the time the section crew started north along the single track. The station agent at Berkley did not go on duty until eight o'clock and there was no telephone connection with other points along the railroad nor was a block system in use. When they started north from Berkley the section crew did not know that train No. 15 had not passed. As the motor car, proceeding north, entered upon the south end of the second trestle south-

bound train No. 15 came into view around the embankment about 200 feet north of the north end of the trestle. Some of the section men at that instant jumped from the motor car as it ran upon the south end of the trestle; others including the deceased remained on the car as it was driven at increased speed across the trestle in an attempt to reach a vantage point for escape at the north end where the men remaining on the car, except Brock, did escape by leaping from the speeding car an instant before it collided with the on-coming train. Brock was killed in the collision.

Plaintiff having abandoned all other assignments of negligence made in her petition the case was submitted to the jury on the one assignment that defendant's employees in charge of the train negligently failed to sound a whistle as the train approached the curve and at intervals while rounding it in violation of a long standing custom to sound the whistle in such manner as trains traveled around this curve and that Brock's death resulted in whole or in part from such negligence of defendant's employees. The defendant made a general denial of the allegations of the petition, pleaded assumption of risk and that deceased's own negligence in violating a rule of the company, designed for the protection of section men in such a contingency, precluded a recovery. Counsel for appellant do not assign error in the admission or rejection of evidence or in the instructions but state in their brief: "we are assigning only the one ultimate error, that of refusing the peremptory instructions requested by the defendant." In this connection appellant's contentions may be summarized as follows: (1) That the violation by the deceased of a standing rule designed to prevent the occurrence of such an accident was the primary cause of the collision and bars a recovery. (2) That there was not sufficient substantial evidence of the alleged custom to sound the whistle as trains approached and passed through the cut and around the curve "to justify a submission of the case" to the jury. (3) That even if the evidence be sufficient to support a finding that such a custom existed it does not appear that "the custom was intended to apply to a class to which section men belonged." (4) That there is not sufficient pleading or proof that decedent "knew of the alleged custom to warn and relied upon it." (5) That it appears as a matter of law that Brock "assumed the risk and danger of the collision." In this summary we have enumerated appellant's arguments in the order in which they are presented in its brief, however, as we view this case, a determination of the second, third and fourth propositions is necessary to a proper discussion and disposition of the first proposition.

In considering whether there was any substantial evidence tending to show the existence of the custom alleged and relied upon

by respondent we must accept as true all evidence in the record relating thereto which is in respondent's favor and also every reason-able inference favorable to her which can be drawn from the evidence. ■ Looking to the evidence tending to show the custom relied upon as the basis of plaintiff's cause of action we find one of the section men, Lepchenski, upon inquiry relating, as is apparent, to the practice alleged to have prevailed of sounding a warning whistle as trains passed through the cuts and around the curves immediately north of Berkley, testified, that trains "have all whistled" in such "curves and cuts." A public road crossed the railroad track about three-fourths of a mile north of the north end of the trestle where the collision occurred, and was known as Gamble crossing. The whistling board for Berkley station was about one-fourth of a mile north of the north end of the trestle and 308 feet north of the north end of the curve. This signal board had formerly been located south of this trestle and between it and the first trestle north of Berkley but sometime during the preceding year had been moved to the point north of the second trestle. Witness Sams testified that he "lived three-fourths or a half mile" from the point where the track curves through the cut and around the embankment; that "the trains always whistle as they travel that track and the curve there;" that he had observed the operation of trains at that point for fourteen years; that trains whistled for Gamble crossing and from the crossing "all the way to the trestle" and that they "whistled from two or three hundred yards north of it to the trestle." Witness Collier stated that he had lived in the vicinity of this trestle, where the collision occurred, for two years preceding the collision and had observed that during that period trains "whistled before they went around the curve and all the way down." It is a reasonable inference from the testimony of this witness as a whole that this statement is to be understood as meaning that trains whistled before entering the curve and all the way from there to the trestle. Witness Woods testified: "I have been around the vicinity of that trestle all of my life and have seen trains going through there" (meaning through the cut and around the curve) and that the trains whistled for the cut and curve north of the trestle. Witness Long stated that he "had lived a half mile from the scene of the collision for about four years." We quote from his direct examination:

"Q. Had you ever been down to the vicinity of this trestle and noticed trains pass there? A. Yes sir, lots of times.

"Q. Can you tell us what, if anything, the trains do approaching that trestle? A. Well I don't think I ever saw one go through there without whistling.

"Q. Did that apply to all trains? A. Yes sir.

"Q. All kinds of trains? A. Yes sir."

It was stated by witness Anderson that he had lived in that vicinity for twenty years; that he had observed trains "passing through the cut immediately north of the trestle" and "never heard them go through there without whistling for those trestles and curves." Witness Perry, who worked for two years near that point on the railroad at which the collision occurred, testified that he had observed trains passing around the curve north of the trestle and that trains "usually whistled as they came around the curve there." Though the testimony of respondent's witnesses was to the effect that for a long period of time trains had whistled upon approaching and entering the cut and in traveling the curve through the cut and around the embankment north of the trestle and that the whistling board 308 feet north of the north end of the curve had been placed at that point only about a year before the collision appellant argues that the testimony of these witnesses is too vague and indefinite to be considered and accepted as substantial evidence of the custom pleaded and that it is evident that their testimony refers to the whistle required and which appellant says was sounded at the whistling post. Appellant offered evidence that there was no rule, custom or practice to sound whistles as trains entered the cut and at intervals in passing around the curve. The existence of a usage or custom "being a matter of fact may be proved as any other fact" (17 C. J. 524) and a mere conflict in the evidence does not render the proof insufficient but makes a question for the jury. The weight of the evidence, which appellant seems to argue, was also for the jury. We think there is substantial evidence tending to show the existence of the alleged custom and to make a submissible issue of fact for the jury.

Witnesses in a position to observe, hear and know testified that the train involved in the collision did not whistle upon entering the curve or cut or at any time thereafter while traveling around the curve and approaching the trestle. The trainmen admitted that such signals were not sounded and denied that such a custom or practice existed. While it is an admitted fact that a whistle was not sounded as the train passed through the cut and curve and around the embankment, according to the alleged custom and practice, appellant asserts that the evidence does not show that had such signals been given they "could have been heard by the deceased under existing conditions and therefore a negligent failure, if any, to sound the whistle could not have changed the result" and for that reason the demurrer to the evidence should have been sustained. Respondent's evidence tended to show a custom to sound the whistle as trains entered the cut and at intervals while passing through the cut and around the curve; that

928

the section crew when traveling along the track on the motor car would listen for the sound of an approaching train and members of the section crew testified that on the morning of the collision the engine of the motor car was shut off and the car was permitted to coast as it approached the trestle reducing the noise caused by the car moving over the rails to a minimum and that they were "listening for whistles and looking as we drove north." Appellant's evidence was that at the time a strong wind was blowing from the southwest, the opposite direction from which the train was moving, and appellant argues that the high embankment east of and around which the track curved not only hid the southbound train from view but would also have obstructed the sound of the whistle had it sounded and that the adverse wind, the high embankment intervening and the noise caused by the wheels of the section car running over the tracks combined to make it "impossible to have heard a whistle a safe distance away if it had been sounded at the curve." This argument takes into consideration only the sounding of a whistle at the north end of the curve while respondent's evidence, reasonably construed, tended to show a long standing custom for trains to whistle at intervals while traveling around the curve and up to or near the north end of the trestle. The evidence relating to this question merely made another issue of fact for the jury and was ample to support a finding that the section men could have heard the customary signals had they been given. The trial court could not properly have sustained appellant's demurrer to the evidence on the ground thus assigned that the evidence conclusively shows that had the whistle been sounded according to the alleged custom it could not have been heard by deceased and members of the section crew.

We next consider appellant's contention that the evidence does not sufficiently show that the custom for trains to sound a whistle on approaching and while traveling around this curve was intended as a warning to section men and intended for their benefit. Appellant says the evidence does not allow that "such custom was intended to apply to a class to which section men belonged." Cases are cited by appellant holding that it is not enough to prove a rule or custom for trains to sound a whistle upon approaching a road crossing or station or upon starting or making other movements but that it must be also shown that the deceased or the injured party, as the case may be, had a right, as one within the class meant to be protected, to rely on such custom being observed. Norfolk R. R. Co. v. Gesswine, 144 Fed. 56, is illustrative of this line of cases. In that case it was held that, "The custom of a railroad to give signals for crossings as required by the statute of Ohio was for the benefit of persons using or about to use the crossings, so that a failure to comply with such custom did not

constitute negligence of which a trackman working near the crossing could complain.'' Another case cited that of C. N. O. & T. P. Ry. Co. v. Harrod's Admr., 132 Ky. 445, holds that station signals are given to notify passengers and station and train employees of the train's approach and that the duty to give such signals is only to those entitled to notice of the approach of the train. Such cases, however, do not afford an analogy for in this case the deceased Brock is not said to have relied upon a statutory crossing whistle or station whistle, the failure to sound which it may be conceded would not have constituted a breach of any duty owing to him. We think the purpose and intendment of a rule or custom is to be arrived at by a consideration of the reason therefor and circumstances of the situation giving rise to and upon which such rule or custom operates. Certainly the custom of sounding the whistle as trains passed through the cut and around this curve was not an idle, purposeless practice, indulged as a mere pastime. It seems a reasonable and inescapable conclusion that at least one purpose was to warn persons who might be upon or near the track at or near the south end of the curve where the view of the track curving to the northeast around the high embankment was completely obscured so that the approach of a southbound train could not otherwise be discovered. And this would include section men traveling to their work as in this case. A natural and reasonable interpretation of the custom relied upon, in the light of the facts and circumstances in evidence, warrants the conclusion that section men were within the class of persons for whose benefit it was intended. The physical situation was admittedly dangerous—a long sharp curve through a deep cut with a high embankment covered with trees and brush along the east side of the track and around which the track curved sharply to the northeast so as to be completely obscured from the view of section men working on the track or trestle or traveling over the track and trestle south of the curve; immediately south of the south end of this obscured curve was the long, high trestle where the collision occurred. These section men were not advised, no means having been provided therefor, of delayed trains or extra trains. They could ascertain the approach of such trains only by looking and listening. The evidence showed that there was no occasion for persons other than section men to be upon the track at or near this curve. There were no road crossings between Gamble crossing and the town of Berkley. From the nature of their work the section men might be required to work upon or travel over this particular part of the track at any time. It might well be assumed that the practice of whistling at intervals while going around this curve sprang from considerations of humanity and caution. In Southern Railway Co. v. Cook, 226 Fed. 1, plaintiff's husband, a section man,

was killed by a train running at a high rate of speed around a curve in violation of a rule limiting the speed at that point and without ringing the bell or sounding the whistle. It was contended that "the slow board rule was intended exclusively for the protection of trains at the cross switch, and not for the protection of section men, and that failure to observe it could not be the basis of a charge of negligence towards workmen on the track." The court said: "The principle is well settled that: 'Where a duty is imposed for the protection of persons in particular situations or relations, a breach of it which happens to result in injury to one in altogether a different situation or relation is not as to him actionable. [St. L. & S. F. Ry. Co. v. Conarty, 238 U. S. 243, 35 Sup. Ct. 785, 59 L. Ed. 1890.'] . . . Often a rule intended primarily for one class of persons is so generally and properly conformed to by other clases that it becomes their protection also. For example, a rule requiring a train to stop at all stations is not intended for the protection of trackmen; but it would be actionable negligence for an engineer to run by a station into a hand car, not removed in time because of reliance by the section foreman on the stop. Where the rule thus directly and constantly affects the safety of others, its disobedience is evidence of negligence toward them. While it is true that the speed rule did not warrant the decedent in relaxing his own vigilance in keeping out of the way of trains, it was one of the factors which he had a right to take into consideration in regulating his conduct; and the failure to observe it was some evidence of negligence as to him." Hunt v. C. B. & Q. R. Co., 303 Mo. 107, 259 S. W. 481, holds that though enginemen are not required to look out for section men on or near the tracks and are therefore not guilty of negligence in failing to ring the bell or sound a whistle or otherwise warn them of the approach of a train *unless* required to do so by some established rule or custom "it is plain" that a rule requiring a whistle to be sounded before passing around curves where the view is obstructed was intended to apply to all employees in danger of being injured while working at, or using track motors upon and near curves where the view is obstructed. [See also Smith v. Chicago B. & Q. R. Co., 321 Mo. 960, 15 S. W. (2d) 794, and Hughes v. Miss. R. & B. T. Ry., 309 Mo. 560, 274 S. W. 703.] The trial court did not err in its refusal to declare as a matter of law that the customary warnings were not to be construed as being intended for the protection of section men.

The next assignment of error made by appellant is that the petition does not allege nor the proof show that the deceased relied upon the alleged custom and that the court therefore erred in overruling appellant's motion in arrest of judgment. Of these questions in reverse order. We have held that there was substantial evidence

to support the finding of the jury that section men were within the class of persons for whose benefit and protection the customary warnings were intended and that deceased had a right, in view of such long standing custom, to rely upon the observance of the custom. The opinion in Koonse v. Mo. Pac. Railroad Co., 322 Mo. 813, 18 S. W. (2d) 467, quotes with approval from St. Louis & S. F. R. Co. v. Jeffries (C. C. A.), 276 Fed. 73, l. c. 75, as follows: " 'A servant has the right to rely on signals and warnings customarily given in the conduct of the business in which he is engaged and if the master fails to give these, he is negligent.' " The opinion then says: "It may also be presumed that deceased knew of the custom and relied on it. [Director General v. Templin, 268 Fed. 483; DeClue v. Railroad, 264 S. W. 992.]" While it may be said there is no direct statement in the testimony that in approaching the trestle and curve north thereof the deceased was acting in reliance upon the custom of sounding the whistle as trains rounded the curve, the inference, we think, may reasonably be drawn from the facts and circumstances in evidence and the conduct of the deceased that he did rely upon such custom. "Reliance is not a tangible fact that one can put his finger on or see with the eye. It is a state of mind and, for the practical purposes of the law, a state of mind must be got at and interpreted through acts, if acts there be." [Knorpp v. Wagner, 195 Mo. 637, 664, 93 S. W. 961, 968.] Respondent's evidence tended to show that the custom was of long standing. The deceased had worked on this section for many years and it naturally follows he must have been familiar with such custom and have assumed, as he had a right to do, that a train approaching from the north through the cut and around the curve would sound the customary whistles. The evidence is that the engine of the motor car was shut off and the motor car was coasting as it approached the trestle, obviously to enable the occupants to hear the sound of a train if any should be approaching around the curve ahead. Some of the section men testified they were looking ahead and listening for "sounds of a train" and for whistles and could have heard same had they been given. Appellant offered in evidence a rule of the company as follows: "1273 . . . they (the section foremen) must see that their hand or push cars . . . are run with great caution at all times; that a constant lookout is kept for trains, and that where there is not a clear view of the track far enough to insure absolute safety, flagmen are sent out with stop signals to protect them; that when they are run at night a white light is displayed in front and a red light on the rear and that they are never attached to trains." Appellant says this rule applied to motor cars operated under conditions shown to have existed in this case. Conceding as appellant argues that the deceased foreman must have been and was

familiar with this rule it may be inferred from his failure to stop the motor car and send a flagman ahead at this point that he was relying upon the custom for trains to sound warning whistles while traveling the curve. It was a jury question and was properly submitted to the jury and the circumstances appearing in the evidence constituted substantial evidence from which the jury was warranted in finding that deceased relied upon the custom. Aside from what we have said about the sufficiency of the evidence in this respect respondent could well rely upon the pronouncement we have quoted, supra, from the opinion in the Koonse case that "it may be presumed that deceased knew of the custom and relied upon it" in a case, such as this, where a custom is shown and the injured party is within the class of persons for whose benefit and protection the practice is maintained and therefore entitled to rely upon its observance. ■ Nor can appellant's attack here upon the sufficiency of the petition asserting that it does not allege that deceased knew of, had a right to and did rely upon the pleaded custom and is therefore fatally defective, be sustained. The petition describes the physical conditions existing at the place of the collision; alleges, that the train was running three hours late; that defendant's servants in charge of the train should have anticipated that section men would likely be traveling upon the track in the performance of their duties and would be unable because of the curve and the obstruction thereof to discover the approach of the train; that there was an established and long standing custom to sound the locomotive whistle when trains approached and as they traveled the curve and charges that Brock's death was directly caused, in whole or in part, by the negligence of the trainmen in failing to sound the whistle in accordance with such custom. Appellant did not challenge the sufficiency of the petition by demurrer or motion. The petition charges that the negligence of defendant's servants in failing to perform the duty imposed upon them by custom directly caused or contributed to the death of Brock and after verdict it must be considered as having stated all essential allegations which may be inferred or implied from its express averments. By reasonable intendment the petition alleges that decedent knew of and relied upon the custom for on no other theory could defendant's negligence in violating the custom have been the proximate cause of the collision and his death. To have alleged that decedent had a right to rely upon the observance of the custom would have been pleading a legal conclusion. From the facts alleged and the proof made, it necessarily follows, as we have held, that decedent had a right to rely upon the whistle being sounded according to custom since appellant owed him a duty in that respect. In De Clue v. Mo. Pac. Ry. Co., (Mo. Sup.), 264 S. W. 992, this court considered an objection made

to the admission of certain evidence on the ground, among others that there was no allegation in the petition that plaintiff, a trainman injured in a switching movement, had knowledge of the custom which defendant's enginemen were charged to have violated thereby causing plaintiff's injuries. The court said, "The objection made really goes to the sufficiency of the petition. If that is sufficient the testimony was properly admitted." The petition described the "usual, established and regular practice" alleged to have been violated in making the switching movement but did not expressly allege that plaintiff had knowledge thereof and relied thereon. It was held that, "if such practice was the 'usual, established, and regular practice' under the circumstances, not only the plaintiff but the engineer, must have known thereof, and such is the natural inference" and that the allegations of the petition were sufficient to make the evidence, objected to, admissible. Substantially the same kind of an objection made by appellant to the sufficiency of the petition in this case was passed upon by this court in Stottle v. Chicago, R. I. & P. Ry. Co, 321 Mo 1190, 18 S. W. (2d) 433. In that case appellant challenged the sufficiency of the petition in that it did not allege "that the deceased was in fact engaged in the duties of his employment at the time." This court said that appellant "overlooked the Statute of Jeofails," Section 1099, Revised Statutes 1929, "which provides that a judgment shall not be reversed, among other things, 'for omitting any allegation or averment without proving which the triers of the issue ought not to have given, such a verdict.' ■ We are not at liberty to ignore the direct command of the statute. After the defendant has gone to trial and evidence is introduced on all the points controverted and the verdict rendered, it is too late then to assert that some fact supported by the evidence and authorizing the verdict is not alleged in the petition. Therefore, if the verdict is supported by the evidence upon all contested points, a failure of the petition to allege some matter necessary to sustain the verdict will not vitiate it." The evidence tending to show, and from which the inferences to that effect arise, that Brock knew the custom pleaded and relied upon same was received without objection that the petition did not contain such allegations. In a recent opinion by Division Two of this court, not yet reported, Harrison, Executor v. Slaton, 49 S. W. (2d) 31, it is said: "If a cause of action is stated, though defectively, and the case is tried and evidence heard without objection as if an allegation of fact necessary to recovery were properly alleged in the petition when it was not so alleged the judgment cannot be assailed on such ground after verdict. [North Nishnabotna Drainage Dist. v. Morgan, 323 Mo. 1, 18 S. W. (2d) 438; Stewart v. Omaha Loan Tr. Co., 283 Mo. 364, 222 S. W. 808.]" It is too well settled to require citation of authori-

ties that an attack on a petition made after verdict, and for the first time on appeal, cannot avail unless the petition wholly fails to state a cause of action. The petition in this case is not subject to that objection.

■ It must be taken as a conceded fact in the case that Brock did not observe rule 1273, set out supra, requiring that in the operation of "hand or push cars" by section men "where there is not a clear view of the track far enough to insure absolute safety" the foreman "must see that . . . flagmen are sent out with stop signals to protect them." Appellant contends that assuming negligence as to deceased, on the part of the trainmen in failing to sound the whistle according to an established custom, and notwithstanding that in an action under the Employers' Liability Act contributory negligence is not a defense, nevertheless the disobedience by Brock of rule 1273, designed for his own safety, precludes recovery. Appellant cites the following cases decided by the Supreme Court of the United States, as sustaining this contention, Great Northern Railway Co. v. Wiles, 240 U. S. 444, 60 L. Ed. 732; Frese v. Chicago R. Co., 263 U. S. 1, 68 L. Ed. 131; Davis v. Kennedy, 266 U. S. 147, 69 L. Ed. 212, and Unadilla Valley R. R. Co. v. Caldine, 278 U. S. 139, 49 S. Ct. 91. Of these in the order listed. Wiles was a rear brakeman on a freight train proceeding east from the station of Grotto. It was nighttime. Immediately after passing around a curve the train broke in two by a draw bar of one of the freight cars "pulling out" which caused the train to stop. Shortly thereafter an eastbound passenger train ran into the standing freight train. The deceased, Wiles, was in the caboose of the freight train and was killed. "What caused the pulling out of the drawbar was not shown, nor was there proof that it was defective or that the company was negligent in the care or use of it." The evidence showed, that "it was Wiles' duty to have gone back to protect the rear end of his train at the time the passenger train was due out of the station in the rear, and that this applied whether the delayed inferior train which was ahead was running or standing still; that it was the duty of Wiles to have gone back a sufficient distance to guarantee full protection to the rear of his train and that the engineer of the freight train, at the time the train broke in two, signaled the rear brakeman to go back and protect the rear of his train;" that before the freight train broke in two and stopped it "was losing time by slipping and that Wiles knew the time that the passenger train was due to leave Grotto station and that he should have dropped off or dropped fusees on the track to notify the engineer of the passenger train that the freight was running slow. The fusees are red and yellow lights; the red means to stop for ten minutes, the yellow means to bring the train under control and keep it under con-

trol until the next station is reached." "The engineer of the passenger train did not know of the freight train ahead and no negligence is attributed to him." Upon the facts which we have quoted at length, from the statement set out in the opinion, it readily appears that no causal negligence on the part of the defendant company was shown and that the failure of the deceased to perform the duties imposed upon him solely by the rules of the company was the sole cause of the collision, as the court held. In the Frese case recovery was sought against the Burlington Railroad for the death of an engineer on a Burlington train which resulted from a collision between his train and a Wabash train at a crossing of the two railroads in the State of Illinois. The action was brought in this State. A statute of the State of Illinois required that a train approaching "a crossing with another railroad upon the same level be brought to a full stop before reaching same and within eight hundred feet therefrom, and the engineer or other person in charge of the engine attached to the train shall positively ascertain that the way is clear and that the train can safely resume its course before proceeding to pass the crossing." Both trains, it appeared, had stopped within the required distance from the crossing but the view of the Wabash track from the Burlington was obstructed intermittently until the Wabash track was reached. The two trains did not discover each other and the collision followed. This court held in effect that the state statute made it the personal duty of the engineer to ascertain that it was safe to proceed before going upon the crossing and that the failure of the engineer to perform that duty was the sole cause of the collision and denied recovery. The plaintiff contended that the fireman, admittedly in a better position to see the approach of the Wabash train on the other railroad, had failed to do all that he could to prevent the collision which was a contributory cause of the collision and even if Freese was negligent, his negligence would not bar recovery under the Federal Employers' Liability Act. The Supreme Court of the United States apparently rested its affirmance upon its conclusion that there was no evidence to support plaintiff's contention that the fireman "did not do all that he could" to prevent the collision, in other words, that there was no evidence of causal negligence on the part of the defendant. The Kennedy case was an action for damages by the administratrix of the deceased Kennedy, an engineer, who was killed in a collision between his train, known as train No. 4 and a train designated No. 1. The tracks were double from Nashville to Shops, Tenn., but from Shops the track was single. Train No. 1 bound for Nashville had the right of way and crew of Kennedy's train, No. 4, westward bound "had instructions never to pass Shops unless they knew as a fact that No. 1 had passed it." On the day of the collision the conductor, being

busy with a crowded train, asked Kennedy "to look out for No. 1 which he agreed" but failed to do and "ran his train on beyond Shops and the collision occurred." No negligence whatsoever was charged or attributed to the crew of train No. 1. Plaintiff had judgment which was affirmed by the Supreme Court of the State of Tennessee "on the ground that the other members of the crew (of train No. 4) as well as the engineer were bound to look out for the approaching train and that their negligence contributed as a proximate cause to the engineer's death." The Supreme Court of the United States said: "It was the personal duty of the engineer positively to ascertain whether the other train had passed. His duty was primary as he had physical control of No. 4, and was managing its course. It seems to us a perversion of the statute to allow his representative to recover for an injury directly due to his failure to act as required on the ground that possibly it might have been prevented if those in secondary relation to the movement had done more." If in the instant case plaintiff was relying upon the alleged failure of other members of the section crew to look and listen for trains the Kennedy case might be considered applicable but the facts present an entirely different situation from that in the Kennedy case. It appeared in the Caldine case that Caldine the conductor in charge of train No. 2, had permanent printed orders that his train was to meet and pass train No. 15 in Bridgewater yard, where No. 15 was to take a siding. Outside the yard there was but a single track. Caldine's train reached Bridgewater yard before No. 15 did, but instead of waiting there, as the orders required, Caldine ordered that the train proceed, and within a short distance collided with No. 15 which had the right of way to Bridgewater yard and Caldine was killed. No negligence was assigned or charged on the part of the trainmen in charge of and operating train No. 15. There was evidence that before Caldine started the train from Bridgewater yard the agent there had received a telephone message from the conductor of No. 15 then at a station two miles distant, that he was leaving for Bridgewater yard. The agent testified that he gave this message to the motorman of Caldine's train but this the motorman denied. It was not claimed that anyone told Caldine of the message. The Court of Appeals of the State of New York affirmed a judgment for plaintiff on the ground that the primary cause of the collision was the failure of the motorman to hold the train at Bridgewater until No. 15 arrived as directed by the rule binding him as well as Caldine, the duty of Caldine being secondary to that of the motorman who was in physical control of the train's movements. The Supreme Court of the United States, however, reversed the judgment, holding in substance that Caldine's disobedience of the rule was the sole cause of the collision and that plaintiff could

not be heard to say that the accident was due in part to the negligence of the motorman in obeying the conductor's command nor could it be attributed in part to the station agent's neglect to warn the conductor. The court said: "It seems to us that Caldine, or one who stands in his shoes, is not entitled as against the Railroad Company that employed him to say that the collision was due to any one but himself. He was in command. He expected to be obeyed, and he was obeyed as mechanically as if his pulling the bell had itself started the train. In our opinion he cannot be heard to say that his subordinate ought not to have done what he ordered. He cannot hold the Company liable for a disaster that followed disobedience of a rule intended to prevent it when the disobedience was brought about and intended to be brought about by his own acts. . . . It seems to us even less possible to say that the collision resulted in part from the failure to inform Caldine of the telephone from train No. 15. A failure to stop a man from doing what he knows that he ought not to do hardly can be called a cause of his act." Appellant urges the correct interpretation of the holding of the court in the foregoing cases to be that announced in an opinion by the Circuit Court of Appeals of the Second Circuit in Paster v. Pennsylvania Railroad (July 28, 1930), 43 Fed. (2d) 908. In that opinion it is said in discussing the Federal Employers' Liability Act: "It was supposed that the violation of a rule was only contributory negligence . . . In a series of late cases, however, under the Federal Employers' Liability Act, the Supreme Court has modified this rule, as we understand it" (citing the Frese, Kennedy and Caldine cases, supra). "In these it was held that disregard by a servant of specific orders or standing rules, promulgated for his own safety; will bar his recovery *though the injury was due as well to the fault of other servants.*" (Italics ours.) While in some of these cases there is language which on its face seems to lend support to this view such language must be considered and analyzed in the light of the facts of the case. We are not inclined to adopt such an interpretation. As we understand the decisions under consideration the court merely applied to the facts of the particular case the recognized rule that where the injured or deceased employee's own negligence is the sole proximate cause of his injury or death there can be no recovery as was said in Illinois Central R. Co. v. Skaggs, 240 U. S. 66, 60 L. Ed. 528, 36 Sup. Ct. 249: "It may be taken for granted that the statute does not contemplate a recovery by an employee for the consequences of an action *exclusively his own;* that is, where his injury does not result in whole or in part from negligence of any of the officers, agents or employees of the employing carrier." (Italics ours.) The Wiles, Frese and Kennedy cases were discussed by this court in Wilson v. Chicago B. & Q. R. Co.,

317 Mo. 647, 665, 296 S. W. 1017, 1025. Our understanding of those cases as there expressed was that recovery was denied because under the facts no causative negligence on the part of other employees of defendant was shown or that the injury was not shown to have resulted "in whole or in part" from the negligence of any other employee. The Employers' Liability Act provides:

"Every common carrier by railroad . . . shall be liable in damages to any person suffering injury while he is employed by such carrier . . . or, in case of the death of such employee, to his or her personal representative, . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents or employees of such carrier." [USCA, Title 45, Chapter 2, Sec. 51.]

"The fact that the employee may have been guilty of contributory negligence shall not bar a recovery but the damages shall be diminished by the jury in proportion to the amount of negligence attributable to such employee." [USCA Title 45, Chapter 2, Sec. 53.]

Though it is suggested by some of the testimony in the case yet respondent did not so plead in her reply and does not urge here that rule 1273 had been abrogated. It seems that the custom for south bound trains to sound whistles while traveling around this obscured and particularly hazardous curve was a precaution taken for the safety of the trains as well as persons, such as section men, who might lawfully and rightfully be upon the track south of the curve. We have held that there is substantial evidence in the record tending to show the existence of the custom pleaded and that the failure to sound the whistle in conformity therewith was negligence as to deceased. There is also ample evidence from which the jury could find that had the customary whistles been sounded they could have been heard by the section crew at a sufficient distance and in time, the conditions considered, to have removed the section car from the track and avoided the collision and, considering the situation as a practical unit, that the collision resulted at least in part from the negligence of the trainmen in failing to observe the duty imposed upon them by the custom. At most Brock was guilty of contributory negligence and we cannot, upon the facts, say as a matter of law that his failure to comply with the rule was the sole cause and that the failure of the trainmen to sound the customary whistle was no part of the causation. Though Brock's negligence contributed to the collision when we reflect that the evidence shows a situation which warrants a finding that the collision could have been averted had the customary whistle been sounded it "would be emptying the statute of its meaning" and nullifying the express provisions thereof "to say that his death did not 'result in part' from the negligence of any of the employees of the road."

[Union Pac. R. Co. v. Hadley, Admr., 246 U. S. 331, 38 Sup. Ct. 318, 62 L. Ed. 751.] We think there is substantial evidence tending to show concurrent acts of negligence operating to cause the accident and under the Employers' Liability Act when the negligence of the injured or deceased employee contributes with defendant's negligence to produce the injury or death the contributory negligence of such employee does not defeat the cause of action but only lessens the damages recoverable.

 As to assumption of risk. The evidence tending to show the trainmen to have been guilty of negligence as to deceased in not sounding the signals required by custom, whereby a sudden and unexpected danger was created, is such that we cannot declare, upon the facts and as a matter of law, that he assumed the risk arising therefrom. Assumption of risk does not include risks "arising from the noncustomary, unknown and not to be anticipated negligence of a fellow servant." [Montgomery v. Baltimore & O. R. Co. (6 C. C. A.), 22 Fed. (2d) 359; Chesapeake Co. v. Proffit, 241 U. S. 462, 36 S. Ct. 620, 60 L. Ed. 1102; Chicago R. Co. v. Ward, 252 U. S. 18, 40 S. Ct. 275, 64 L. Ed. 430.] The deceased had a right to depend on the giving of the customary signals and did not "assume the risk of injury if, and in so far as, it" grew out of the negligent failure to sound such warnings "unless the hazard from *that* source was obvious or fully known and appreciated by him." [O'Donnell v. Baltimore & O. R. Co., 324 Mo. 1097, 1107, 26 S. W. (2d) 929, 933, and cases there cited.]

The trial court having correctly ruled the peremptory instructions submitted by appellant its judgment is affirmed. *Sturgis* and *Hyde, CC.,* concur.

PER CURIAM:—The foregoing opinion by FERGUSON, C., is adopted as the opinion of the court. All of the judges concur.