Garland WRIGHT, Respondent,

v.

**CHICAGO, BURLINGTON & QUINCY RAIL-
ROAD COMPANY, A Corpo-
ration, Appellant.**

No. 50947.

Supreme Court of Missouri,

Division No. 2.

July 12, 1965.

Frank X. Mattes, St. Louis, and Edward Murphy, East St. Louis, Ill., William R. Kirby, St. Louis, of counsel, for respondent.

Lucas & Murphy, by Joseph A. Murphy, St. Louis, for appellant.

PRITCHARD, Commissioner.

Plaintiff was a railroad car inspector for defendant in its railroad yards in North Kansas City, Missouri, on the day of the occurrence herein, November 18, 1962. Plaintiff claims damages for personal injuries under the Federal Employers' Liability Act, 45 U.S.C.A. § 51 et seq. His case was submitted to the jury upon two conjunctive theories of negligence embodied in Instructions Nos. 6 and 7. The first of these is to the effect that a manner and method of straightening a bent "sill step" on a boxcar by use of a wooden $2'' \times 4''$ pry or lever was not reasonably safe; the second is that plaintiff's co-worker, a foreman, suddenly and without any warning slackened off or let up on the lifting of said timber and changed positions and shifted the weight and pressure to plaintiff, thereby causing his injuries, as claimed, to his low back and groin (a herniated intervertebral disk, and a right inguinal hernia).

Defendant says that there was insufficient evidence to justify submission of the two theories of negligence to the jury and to support the verdict for damages based on a herniated disk. It also contends that questions by plaintiff's counsel to the jury panel during the voir dire examination with respect to the amount sued for ($75,000.00 prayed for in the petition; $64,550.00 or $64,355.00 stated during voir dire examination) pledged the jury in advance to a verdict, and that its motion for mistrial and to discharge the jury by rea-

son thereof was improperly denied. Further points of defendant on this appeal are that the verdict of the jury was so excessive as to show that it was the result of bias and prejudice of the jury; and that the final judgment is excessive.

The jury returned a verdict of $64,355.00. On after-trial rulings the court ordered a remittitur of $18,855.00 upon the ground that the verdict was excessive, to which remittitur plaintiff consented, and final judgment was entered in the amount of $45,500.00.

■ Plaintiff's version of the occurrence follows, to which we give full credence and favorable inference as well as to his other evidence inasmuch as the sufficiency of the evidence to support the verdict is challenged. Bunch v. Missouri Pacific Railroad Company, Mo., 386 S.W. 2d 40, 42 [1].

Plaintiff was employed by defendant with duties as a car inspector when he was injured. His duties consisted of placing train cars "on air" (coupling the hoses between them), and inspecting them for "penalty" defects. There was a string of about 40 cars upon the north-south yard track 8, which cars plaintiff's foreman, Fischer, told him to inspect and to put on air. Plaintiff walked north along the west side of the train of cars inspecting them as he went. As he reached the boxcar in question he saw that the sill step (or stirrup) thereon was bent about 4 inches underneath, inward and upward. This sill step was constructed in a "U" shape, of flat iron ⅝ inch thick and about 2 inches wide. It hangs down from the edge or overhang of the car bed and makes a stirrup 12 inches in length and width. The metal was twisted about half way around so that its ends could be welded or riveted to the edge of the boxcar. Plaintiff marked the bent sill step with chalk, walked on to the north end of the train of cars, and then started back down the east side thereof. After plaintiff had walked south for several car lengths, Fischer called

to him to come over to the west side of the track. Plaintiff climbed over car couplings and saw that Fischer was carrying two two-by-four boards 10 feet long and nailed together. When they got back to the boxcar with the bent sill step Fischer said to plaintiff, "We will put the two-by-four in through the sill step underneath the car."

At the point where the boxcar with the bent sill step was located, the distance between tracks 7 and 8 was 8 feet; from the bottom of the floor of the car to the ground the distance was about 3½ feet, the overhang of the car was about 1½ feet; the ties extended out from the rails on track 8 about 1½ feet; the ties were about 2½ inches above the ground; and the rails of track 8 were 5 or 6 inches above the ties. The weight of the two-by-four boards, being old ones, was about 20 pounds.

Fischer told plaintiff they could insert the two-by-fours through the sill step underneath the floor of the car and push the step out. Plaintiff protested, "It's impossible. That's a heavy-duty. It should be sent to the repair track." Fischer replied that they could do it and when plaintiff suggested they could get another man, he replied further that one was not needed.

Plaintiff then placed himself about 2½ feet from the side of the car with the two-by-four on his right shoulder. He glanced back and saw Fischer standing east of the rail on track 7 with his feet on the ties and with the two-by-fours on his left shoulder. Fischer then shouted "go." Plaintiff turned back to the boxcar and they both lifted up until Fischer shouted "stop." Fischer then said, "We will take another bite," so plaintiff pushed the two-by-four through and again put it on his right shoulder, crouched down again, looked back at Fischer, who was then standing in the same position, and who again shouted "go," so they "went up." About that time plaintiff felt "an awful lot of weight" on him, a twist in his back and a kind of pulling in

his side, and plaintiff knew Fischer had quit lifting, because (as plaintiff testified) he would not have gotten all that weight if Fischer had not quit. Plaintiff did not turn loose of the timbers but glanced over his right shoulder and saw that Fischer had changed positions—he was standing on top of the east rail on track 7 with the board above his shoulder, at which time he said "go" again. Plaintiff turned and went up again, and that time he had to go up on his toes, and when he came down his knees buckled. Plaintiff told Fischer that he could not lift any more; that he had hurt his back.

On the second attempt the sill was bent downward 2 or 3 inches (from its original approximate 4 inches). When plaintiff was doing the work he was holding up the weight of the boards and against the "spring" (tension) of the cold sill step. He testified that cold steel would spring when it is hit or pulled—it always goes back. When one surges on it, if it is pushed out 3 inches it will go back approximately one inch.

On the first attempt Fischer shouted "stop," but did not do so the second time, and did not tell plaintiff he was going to turn loose or give him any warning about letting up on the upward push of the boards.

Plaintiff testified that he never did do the work, or see it done, the way it was done at the time of his injury. For heavy repairs the car is taken to the shop to be heated with an acetylene torch and straightened on the car with a sledge hammer or something to knock it out. Another way to straighten the sill is to burn out the rivets, take it off the car and into the shop where it is heated and pounded back into position.

Floyd B. Warner testified for plaintiff that he had worked in the car department of the Union Pacific Railroad, on the repair ("rip") tracks and in the yards, for 41 years. He had repaired and seen repaired bent sill steps on many occasions.

There was in existence a custom and practice on his railroad in doing that type of work, which was "open, universal, common, notorious and well known." That custom and practice, Warner testified, was that the sill step was heated and forced into proper shape or position by hammering or exerting pressure, or if it is badly bent, the rivets or bolts are cut out and the sill step is removed and taken to the furnace, fabricated and welded, brought back and bolted or riveted on the car. That kind of work is done on the repair tracks. Warner had never seen the work done by the use of two-by-four timbers on cold metal; there is a resiliency in all metal which when struck gives a spring reaction. On cross-examination Warner testified that the sill step is always removed from the car unless it is possible to bring heat to the car, which is done in remote cases to expedite the movement of a train.

Cecil H. Whitmer of the Kansas City Terminal Railway car department testified that the existing custom and practice of straightening bent sill steps is to "bad-order" the car and take it to the "rip" track to be straightened by the use of heat. He had never seen that type of work done upon cold metal with a couple of boards.

William Delbert Crosley testified to the existing custom and practice substantially the same as Warner and Whitmer, and that he had never seen the work done where a couple of boards were used to pry up a sill step when the metal was cold.

■ In its attack upon the sufficiency of the evidence to support the verdict, defendant says that under Instruction No. 6 plaintiff failed to adduce sufficient proof that the method used to straighten the sill step was dangerous and not customarily used in the Kansas City area, and that defendant knew or should have so known. The only argument made is that plaintiff did not "bad-order" the car, but instead put two chalk marks on it, when he was first on the west side of the car in his

inspection trip. Defendant says, "Had plaintiff not thought that the sill step was to be straightened in the yards he would have bad-ordered the car and the same would have been sent to the repair track for attention to the sill step." The argument overlooks the fact that during his tour of duty plaintiff could have much later "bad-ordered" the car as the train was not due to leave until late that evening, as plaintiff testified. The argument further overlooks the fact that plaintiff objected to the direction of his foreman, Fischer, in the use of the two-by-fours to straighten the sill step "cold" and in the yards. No unfavorable inference can be drawn against plaintiff from the fact that he did not bad-order the car immediately. The inference could be, on the other hand, that in view of his foreman's orders on the spot to use the two-by-fours, plaintiff did not have an opportunity to request that the repairs be done pursuant to a "bad-order" card attached to the car.

■ The custom and practice here of heating the sill step was adequately proved by plaintiff and his three witnesses, Warner, Crosley and Whitmer, all of whom testified on the subject. All of that testimony showed that there was an "open, universal, common, notorious and well known" custom and practice in doing the work of sill step straightening on three railroads, other than defendant's, in the Kansas City area. Such evidence is admissible and relevant to the inquiry of whether or not defendant used reasonable care and prudence in the method its foreman employed in straightening the sill step in its yards. "While, as stated, a custom is not conclusive as a standard of reasonable prudence, there is a reasonable basis for the contention that what is ordinarily done by men generally, engaged in a similar activity, has some relevancy to the inquiry as to what an ordinarily prudent person would do under the same circumstances." 38 Am.Jur. Negligence, § 34, p. 681. See also Cleghorn v. Terminal Railroad Ass'n of St. Louis, Mo., 289 S.

W.2d 13, 18 [5–9]; Gatzke v. Terminal Railroad Ass'n of St. Louis, Mo., 321 S.W. 2d 462, 466 [2–4]; 137 A.L.R. 613; 35 Am.Jur. Master and Servant, § 515 (Supp.); and 43 A.L.R.2d 619 et seq., presenting discussion and annotations of cases as to the sufficiency of rules, practices, precautions, etc., used by defendant and other railroads.

The evidence of custom and practice here is within the standards of admissibility in a leading case (cited by defendant) on the subject, Davis v. Gatewood, Mo., 299 S.W.2d 504. The witnesses possessed knowledge of the existence of the custom; it was not confined to the practice of certain individuals only; the testimony related to definite uniform and known practices under certain definite and uniform circumstances; and the existence of the custom or usage here is a matter of fact susceptible to proof as any other fact. Brock v. Mobile & Ohio R. Co., 330 Mo. 918, 51 S.W.2d 100; Goslin v. Kurn, 351 Mo. 395, 173 S.W.2d 79.

Defendant further contends that plaintiff failed to adduce any probative evidence of the charge of negligence in Instruction No. 7 that Fischer, plaintiff's foreman, "let up" or changed positions during the lifting of the two-by-fours. It says that plaintiff's testimony that Fischer changed position *during* the second lift is not probative evidence that he did. The argument seems to be that plaintiff looked at Fischer after they had completed the second lift, and presumably the inference urged is that plaintiff could not have seen Fischer change positions during the lift. The argument ignores other evidence. Plaintiff testified he put the two-by-fours on his right shoulder, then glanced back and saw Fischer standing with his feet on the ties of the east rail of track 7. At the beginning of the second lift Fischer was in that same position. During the second lift, plaintiff felt "an awful lot of weight on him" and knew that Fischer had then quit lifting. Plaintiff then looked back and saw that Fischer had changed his position from the top of the ties to the top of the rail

on track 7. This was sufficient evidence for the jury to find that Fischer "let up" on his lifting in order that he might change positions during the lifting operation. No contention is made concerning Fischer's failure to warn plaintiff that he was going to change positions.

The evidence shows that as Fischer quit lifting his part of the two-by-fours plaintiff felt "an awful lot of weight on him," a twist in his back and a "kind of pulling in his side." The testimony of plaintiff and other of his witnesses was that steel of the type in the sill step will "spring" back in its tension when it is pushed against. We cannot say that the jury would not be justified in finding that a sufficient downward force was placed upon plaintiff as to cause his injury, as alleged. It was not merely the weight of the two-by-fours (20 pounds) which was placed upon plaintiff, but it was also the force of the "spring back" of the steel sill step.

There is no question but that plaintiff made a case of injury for a herniated disk. At the time of the alleged injury, plaintiff felt a twist in his back and a pulling in his groin. He thereafter developed severe pain in his low back. His physician, Dr. Sylvester H. Pranger, M.D., caused medication for pain to be administered; prescribed massage and traction, and that a back brace be worn by plaintiff. X-rays were taken which showed a narrowing of the vertebral interspace between the fifth lumbar vertebra and the first sacral segment, which indicated that some of the material therein, the nucleus pulposus, had escaped into the neural canal causing pressure on the nerves which in turn produced pain in the low back and which radiated into the left leg. The doctor's diagnosis was that of a herniated disk in this area, and the causal connection thereof to the incident of November 18, 1962 was established. Although this is a case of *diagnosed* herniated disk (no myelogram was performed, and no opera-

tion for removal of the disk or fusion of vertebrae was done, compare Johnson v. Missouri-Kansas-Texas Railroad Company, Mo., 374 S.W.2d 1, 5 et seq.), there was sufficient substantial evidence with which the jury could find, in its prerogative, that plaintiff did suffer the injury which he claimed. Defendant's Point I, raising the submissibility of plaintiff's case in the respects above mentioned, is overruled.

By Point II, defendant raises the issue that the court erred in refusing to grant its motion for mistrial and to discharge the jury panel because of counsel's interrogation of the jury panel during voir dire examination concerning the requested amount for damages. The voir dire examination complained of is as follows (our italics added):

"'Mr. Edward Murphy: Mr. Reynolds, under the law, if you return a verdict in favor of Mr. Wright, it is your duty to decide the amount that he should receive for his injuries. In this regard, I want you to know, and I want all members of the jury to know, just what we are asking for, the amount of money we are asking for.

Mr. Joseph Murphy: If the Court please, I don't think that's proper on voir dire.

The Court: Objection overruled.

Mr. Edward Murphy: After you have heard all the evidence and instructions of the Court *we will ask for money for loss of wages, past and future, and money for past pain, future pain, in the total amount of $64,550.00. Does that sum of money seem completely out of line to you? Is that too large? You don't believe you could compensate the man in that amount if the evidence showed, and under the instructions of the Court, he was entitled to it?*

Mr. Reynolds: For internal injuries?

Mr. Edward Murphy: Well—

The Court: (Interrupting) One moment, please. We are getting a little too far afield. I will permit you to state the amount you are suing for in your petition, and I think you should confine your question, whether that sum in and of itself, would prejudice or make him have any feeling that he couldn't hear this case impartially and let it go at that. In other words, anything about that particular sum that would make him have any feeling that he couldn't fairly decide this particular case.

Mr. Edward Murphy: Now, Mr. Reynolds, as the judge said, *the fact we are asking for $64,355.00, you wouldn't throw up your hands and say "No man is worth that because he's injured," would you?*

Mr. Reynolds: No.

Mr. Edward Murphy: You would listen to the evidence and listen to the instructions of the Court and then you would make up your mind?

Mr. Joseph Murphy: If the Court, please, I object to that. I would like to approach the bench.

(Thereupon the following occurred out of the hearing of the jury panel:)

Mr. Joseph Murphy: I move that this panel be discharged and another one sent up because of the undue prejudicial remarks of counsel. The first objection which was overruled, even though I disagree with the Court, the Court may or may not have been right, but upon admonition by the Court, on his own motion, counsel thereafter continued to argue the amount of damages in a prejudicial way, undue emphasis on the same, the same would be undue repetition throughout. This is

only on voir dire. This isn't opening statement or argument.

The Court: I will sustain the objection in part; however, the request for mistrial will be denied. I don't think we need any further reference to the amount, unless you want to ask the jury as a whole whether there is anything about this particular amount they would have any feeling they couldn't listen and fairly decide this case.

Mr. Edward Murphy: If the Court, please, we are asking for a substantial amount of money and I believe there might be people on the jury that might feel this is just astronomical and no injury is worth that much. I don't think to ask every juror the question—I think I should be able to ask several jurors as we go down the panel this question.

The Court: I think one question will be sufficient to ask the jury panel whether there is anything about this particular amount that would place them in a position where they couldn't fairly and impartially decide the case, and then you can save the rest of that for argument.

(Thereupon, the trial was resumed before the jury panel as follows:)

Mr. Edward Murphy: Mr. Reynolds, will you follow the instructions of the Court and listen to the evidence in this case?

Mr. Reynolds: Yes.

\*　　\*　　\*　　\*　　\*　　\*

Mr. Edward Murphy: How old is the oldest?

Mr. Boyer: Fourteen.

Mr. Edward Murphy: Now, Mr. Boyer, *we are going to ask here for damages for injuries that Mr. Wright sustained and the Court is going to instruct you that you can return money damages for loss of wages in the past,*

*loss of wages in the future, money damages for pain and suffering in the past and pain and suffering in the future.* Now you will follow the instructions of the Court on this point and also listen to the evidence?

Mr. Boyer: Yes.

Mr. Edward Murphy: *If the sum we asked for is substantiated by the evidence, you will return a verdict for that amount?*

Mr. Joseph Murphy: If the Court please—

The Court: (Interrupting) Objection sustained. The jury is instructed to disregard that. You can't commit the jury to any particular finding at this particular time. Any further question along this line, the Court will entertain a motion for mistrial and discharge this panel.

(Thereupon the following occurred out of the hearing of the jury panel:)

Mr. Joseph Murphy: I would like at this time to move again for discharge of the panel, because it has been unduly prejudiced by the rapidity of the questions and by the failure of plaintiff's counsel to follow the earlier admonition of this Court.

The Court: Request for mistrial will be denied at this time.

Mr. Edward Murphy: Judge, before, you said I could ask that question.

The Court: That's not the question you asked.

Mr. Edward Murphy: You said I could ask the whole panel one time, is that correct, sir?

The Court: Yes, I told you you could ask the panel at one time whether that particular amount would make them have any feeling that they couldn't fairly and impartially decide this case. You are assuming before they have heard any evidence these things will be substantiated. Frank [Frank Mattes, co-counsel for plaintiff] came up here and I thought he gave you the right question when he suggested to you to ask them, at the conclusion, the Court would give them the instructions and will they follow the law and will they follow the instructions.' "

The trial court necessarily has discretion in the permitting or denying of questions upon voir dire examination and in ruling upon requests for mistrial. Smith v. Aldridge, Mo.App., 356 S.W.2d 532, 536 [6–8], for which counsel is and should be granted a wide latitude. 31 Am.Jur. Jury, § 139, p. 121; Faught v. St. Louis-San Francisco Railway Co., Mo., 325 S.W.2d 776, 779 [1, 2]. The reason for the latter rule is to ascertain the qualifications and competency of members of the jury panel in the interest of securing a fair and impartial jury. Moore v. Middlewest Freightways, Inc., Mo., 266 S.W.2d 578, 585 [8–12]; Eickmann v. St. Louis Public Service Company, Mo., 323 S.W.2d 802, 807 [7–10].

In the instant case, however, and although counsel had the right to ascertain from the jury panel any bias or prejudice by reason of the amount sued for which would render it impossible or difficult for them to render a fair and impartial verdict based upon the evidence and the instructions of the court, the examination could not go so far as to commit or pledge the jury to a certain verdict or amount thereof in advance of hearing all of the evidence. Certainly, there should be no argumentative matters presented. Annotation, 82 A.L.R.2d 1420; and see the Missouri cases cited therein. Here, the italicized portions of the above voir dire examination are clearly argumentative in nature and suggestive of the amount of verdict the jury ought to return, and of the type criticized in Goldstein v. Fendelman, Mo., 336 S.W.2d 661, 665 [4], and in Moore v. Ready Mixed Concrete Co., Mo., 329

S.W.2d 14, 22. Furthermore, the tendency of the italicized quotations is to commit or pledge the jury to a particular verdict. For these reasons the voir dire examination is ruled improper. That it was prejudicial to defendant is indicated by the fact that the jury returned a verdict of $64,355.-00, the exact amount which counsel for plaintiff mentioned at one place, and only $195.00 less than that mentioned in another place, in the voir dire examination.

It is unnecessary to consider other points raised.

The judgment is reversed and the case is remanded for new trial.

BARRETT and STOCKARD, CC., concur.

PER CURIAM.

The foregoing opinion by PRITCHARD, C., is adopted as the opinion of the Court.

All of the Judges concur.